## UNITED STATES v. SWIFT & CO. ET AL.*

No. 568.   Argued March 17, 18, 1932.—Decided May 2, 1932.

* Together with No. 569, American Wholesale Grocers Assn. et al. v. Swift & Co. et al.; and No. 570, National Wholesale Grocers Assn. v. Same.

(For opinion below see U. S. Daily, Jan. 6, 1931.)

*Assistant to the Attorney General O'Brian,* with whom
*Solicitor General Thacher,* and *Messrs. Charles H. Weston*

and *Hammond E. Chaffetz* were on the brief, for the United States.

*Mr. Edgar Watkins,* with whom *Messrs. Mac Asbill* and *Edgar Watkins, Jr.,* were on the brief, for the American Wholesale Grocers Assn. et al., appellants.

*Mr. Wm. C. Breed,* with whom *Messrs. Dana T. Ackerly, Sumner Ford,* and *Edward A. Craighill, Jr.,* were on the brief, for the National Wholesale Grocers Assn., appellants.

*Mr. Frank J. Hogan,* with whom *Messrs. Paul M. Godehn, Henry Veeder, Charles J. Faulkner, Jr.,* and *Nelson T. Hartson* were on the brief, for Swift & Co. et al., appellees.

By leave of Court, briefs of *amici curiae* were filed: by *Mr. Dayton Moses* on behalf of the Texas & Southwestern Cattle Raisers' Assn. et al., and by *Messrs. George A. Clough* and *R. C. Fulbright* on behalf of the American National Live Stock Assn. et al.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

A decree of the Supreme Court of the District of Columbia has modified an earlier decree of the same court which enjoined the continuance of a combination in restraint of trade and commerce.

Separate appeals, one by the United States of America, and the others by associations of wholesale grocers intervening by leave of court, have brought the case here, Judicial Code, § 238; U. S. Code, Title 28, § 345.

In February, 1920, a bill was filed by the Government under § 4 of the Act of July 2, 1890 (c. 647, 26 Stat. 209;

U. S. Code, Title 15), known as the Sherman Antitrust Act, against the five leading meat-packers in the United States to dissolve a monopoly. The packers joined as defendants were Swift & Company, Armour & Company, Wilson & Company, the Morris Packing Company, and the Cudahy Packing Company, together with their subsidiaries and also their chief officers. The charge was that by concert of action the defendants had succeeded in suppressing competition both in the purchase of live stock and in the sale of dressed meats, and were even spreading their monopoly into other fields of trade. They had attained this evil eminence through agreements apportioning the percentages of live stock to which the members of the combinations were severally entitled; through the acquisition and control of stockyards and stockyard terminal railroads; through the purchase of trade papers and journals whereby cattle raisers were deprived of accurate and unbiased reports of the demand for live stock; and through other devices directed to unified control. " Having eliminated competition in the meat products, the defendants next took cognizance of the competition which might be expected " from what was characterized as " substitute foods." To that end, so it was charged, they had set about controlling the supply of " fish, vegetables, either fresh or canned, fruits, cereals, milk, poultry, butter, eggs, cheese and other substitute foods ordinarily handled by wholesale grocers or produce dealers." Through their ownership of refrigerator cars and branch houses as well as other facilities, they were in a position to distribute " substitute foods and other unrelated commodities " with substantially no increase of overhead. Whenever these advantages were inadequate, they had recourse to the expedient of fixing prices so low over temporary periods of time as to eliminate competition by rivals less favorably situated. Through these and

other devices there came about in the view of the Government an unlawful monopoly of a large part of the food supply of the nation. The prayer was for an injunction appropriate to the case exhibited by the bill.

The defendants consented to dismemberment, though answering the bill and traversing its charges. With their answer there was filed a stipulation which provided for the entry of a decree upon the terms therein set forth and provided also that the decree " shall not constitute or be considered as an adjudication that the defendants, or any of them, have in fact violated any law of the United States." The decree entered on February 27, 1920, enjoined the defendants from maintaining a monopoly and from entering into or continuing any combination in restraint of trade and commerce. In addition they were enjoined both severally and jointly from (1) holding any interest in public stockyard companies, stockyard terminal railroads or market newspapers, (2) engaging in, or holding any interest in, the business of manufacturing, selling or transporting any of 114 enumerated food products, (principally fish, vegetables, fruit and groceries), and thirty other articles unrelated to the meat packing industry; (3) using or permitting others to use their distributive facilities for the handling of any of these enumerated articles, (4) selling meat at retail, (5) holding any interest in any public cold storage plant, and (6) selling fresh milk or cream. No injunction was granted in respect of the sale or distribution of poultry, butter, cheese and eggs, though these had been included in the bill among the substitute foods which the defendants were seeking to engross. The decree closed with a provision whereby jurisdiction of the cause was retained for the purpose of taking such other action or adding at the foot such other relief " as may become necessary or appropriate for the carrying out and enforcement " thereof, " and for the purpose of entertaining at

any time hereafter any application which the parties may make" with reference thereto.

The expectation would have been reasonable that a decree entered upon consent would be accepted by the defendants and by those allied with them as a definitive adjudication setting controversy at rest. The events that were to follow recount a different tale. In April, 1922, the California Co-operative Canneries Corporation filed an intervening petition alleging that the effect of the injunction was to interfere with the performance by Armour & Company of a contract by which Armour had agreed to buy large quantities of California canned fruit, and praying that the decree be vacated for lack of jurisdiction. Leave to intervene was granted by the Court of Appeals of the District, which ordered " that such further proceedings thereupon be had as are necessary to determine the issue raised." In November, 1924, motions for like relief were made by Swift and by Armour, their subsidiaries and officers. The motions were denied by the Supreme Court of the District, and thereafter were considered by this court, which upheld the consent decree in the face of a vigorous assault. *Swift & Co.* v. *United States,* 276 U. S. 311. In the meantime, however, an order had been made on May 1, 1925, by the Supreme Court of the District at the instance of the California Canneries whereby the operation of the decree as a whole was suspended " until further order of the court to be made, if at all, after a full hearing on the merits according to the usual course of chancery proceedings " (see *United States* v. *California Canneries,* 279 U. S. 553, 555). This order of suspension remained in force till May, 1929, when a decision of this court swept the obstacle aside. *United States* v. *California Canneries, supra.*

The defendants and their allies had thus been thwarted in the attempt to invalidate the decree as of the date of its entry, and again the expectation would have been reasonable that there would be acquiescence in its restraints.

Once more the expectation was belied by the event. The defendants, or some of them, discovered as they thought that during the years that had intervened between the entry of the decree and its final confirmation, conditions in the packing industry and in the sale of groceries and other foods had been transformed so completely that the restraints of the injunction, however appropriate and just in February, 1920, were now useless and oppressive. The discovery or supposed discovery had its fruit in the proceeding now before us. On April 12, 1930, the defendants Swift & Company and Armour & Company and their subsidiaries, being no longer under the shelter of an order suspending the injunction, filed a petition to modify the consent decree and to adapt its restraints to the needs of a new day. The prayer was that the petitioners be permitted (1) to own and operate retail meat markets; (2) to own stock in stockyard companies and terminal railroads; (3) to manufacture, sell and deal in the 144 articles specified in paragraph fourth of the decree, which for convenience will be spoken of as " groceries;" (4) to use or permit others to use their distributive facilities in handling such commodities; and one of the defendants, Swift & Company, asked in addition that the defendants be permitted to hold interests in public cold-storage warehouses and to sell fresh milk and cream. Of the five defendants named in the original suit, one, Morris & Company, sold out to Armour & Company in 1923, and discontinued business. The two other defendants, Wilson and Cudahy, did not join in the petition to modify the decree, but stated in open court that they would consent to such modification as the court might order provided it be made applicable to the defendants equally. All the requests for modification were denied except numbers 3 and 4, of which 4 is merely ancillary to 3 and calls for no separate consideration. The modification in respect of number 3 gave permission to deal at wholesale

in groceries and other enumerated commodities, but maintained the injunction against dealing in them at retail. In every other respect, the decree of February 27, 1920, was continued in force as originally entered. The modifying decree, which was entered January 31, 1931, is the subject of this appeal.

We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent. The power is conceded by the Government, and is challenged by the interveners only. We do not go into the question whether the intervention was so limited in scope and purpose as to withdraw this ground of challenge, if otherwise available. Standing to make the objection may be assumed, and the result will not be changed. Power to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. *Ladner* v. *Siegel,* 298 Pa. St. 487, 494, 495; 148 Atl. 699; *Emergency Hospital* v. *Stevens,* 146 Md. 159; 126 Atl. 101; *Larson* v. *Minn. N. Electric Ry. Co.,* 136 Minn. 423; 162 N. W. 523; *Lowe* v. *Prospect Hill Cemetery Assn.,* 75 Neb. 85; 106 N. W. 429; 108 N. W. 978. The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative. *Ladner* v. *Siegel, supra.* The result is all one whether the decree has been entered after litigation or by consent. *American Press Assn.* v. *United States,* 245 Fed. 91. In either event, a court does not abdicate its power to revoke or modify its mandate if satisfied that what it has been

doing has been turned through changing circumstances into an instrument of wrong. We reject the argument for the interveners that a decree entered upon consent is to be treated as a contract and not as a judicial act. A different view would not help them, for they were not parties to the contract, if any there was. All the parties to the consent decree concede the jurisdiction of the court to change it. The interveners gain nothing from the fact that the decree was a contract as to others, if it was not one as to them. But in truth what was then adjudged was not a contract as to any one. The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.

Power to modify existing, we are brought to the question whether enough has been shown to justify its exercise.

The defendants, controlled by experienced business men, renounced the privilege of trading in groceries, whether in concert or independently, and did this with their eyes open. Two reasons, and only two, for exacting the surrender of this adjunct of the business were stated in the bill of complaint. Whatever persuasiveness the reasons then had, is theirs with undiminished force today.

The first was that through the ownership of refrigerator cars and branch houses as well as other facilities, the defendants were in a position to distribute substitute foods and other unrelated commodities with substantially no increase of overhead. There is no doubt that they are equally in that position now. Their capacity to make such distribution cheaply by reason of their existing facilities is one of the chief reasons why the sale of groceries has been permitted by the modified decree, and this in the face of the fact that it is also one of the chief reasons why the decree as originally entered took the privilege away.

116

The second reason stated in the bill of complaint is the practice followed by the defendants of fixing prices for groceries so low over temporary periods of time as to eliminate competition by rivals less favorably situated.

Whether the defendants would resume that practice if they were to deal in groceries again, we do not know. They would certainly have the temptation to resume it. Their low overhead and their gigantic size, even when they are viewed as separate units, would still put them in a position to starve out weaker rivals. Mere size, according to the holding of this court, is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly (*United States* v. *United States Steel Corp.*, 251 U. S. 417; *United States* v. *International Harvester Co.*, 274 U. S. 693, 708), but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past. The original decree at all events was framed upon that theory. It was framed upon the theory that even after the combination among the packers had been broken up and the monopoly dissolved, the individual units would be so huge that the capacity to engage in other forms of business as adjuncts to the sale of meats should be taken from them altogether. It did not say that the privilege to deal in groceries should be withdrawn for a limited time, or until the combination in respect of meats had been effectually broken up. It said that the privilege should be renounced forever, and this whether the units within the combination were acting collectively or singly. The combination was to be disintegrated, but relief was not to stop with that. To curb the aggressions of the huge units that would remain, there was to be a check upon their power, even though acting independently, to wage a war of extermination against dealers weaker than themselves. We do not turn aside to inquire whether some of these restraints upon separate as distinguished from joint action could have been opposed with success if the de-

fendants had offered opposition. Instead, they chose to consent, and the injunction, right or wrong, became the judgment of the court. Groceries and other enumerated articles they were not to sell at all, either by wholesale or by retail. Even the things that they were free to sell, meats and meat products, they were not to sell by retail. The court below annulled the restraint upon sales of groceries by wholesale, but retained the prohibition in respect of sale by retail both for groceries and for meats. The one prohibition equally with the other was directed against abuse of power by the individual units after the monopoly was over; and the death of the monopoly, the breaking up of the combination, if an adequate reason for terminating one of them, is an adequate reason for terminating both.

We have said that the defendants are still in a position, even when acting separately, to starve out weaker rivals, or at least that the fear of such abuses, if rational in 1920, is still rational today. The meat monopoly has been broken, for the members now compete with one another. The size of the component units is substantially unchanged. In 1929, the latest year for which any figures are furnished by the record, the sales made by Swift and Armour, each, amounted to over a billion dollars; those made by all the defendants together to over $2,500,-000,000; and those made by their thirteen chief competitors to only $407,000,000. Size and past aggressions induced the fear in 1920 that the defendants, if permitted to deal in groceries, would drive their rivals to the wall. Size and past aggressions leave the fear unmoved today. Changes there have been that reduce the likelihood of a monopoly in the business of the sale of meats, but none that bear significantly upon the old-time abuses in the sale of other foods. The question is not whether a modification as to groceries can be made without prejudice to the interests of producers of cattle on the hoof. The question is whether it can be made without prejudice

to the interests of the classes whom this particular restraint was intended to protect. Much is made in the defendants' argument of the rise of the chain stores to affluence and power, and especially of chains for the sale of groceries and other foods. Nothing in that development eradicates the ancient peril. Few of the chain stores produce the foods they have for sale, and then chiefly in special lines. Much, indeed most, of what they offer, they are constrained to buy from others. They look to the defendants for their meats, and if the ban of this decree is lifted, they will look to the defendants for other things as well. Meats and groceries today are retailed at the same shops, departments of a single business. The defendants, the largest packers in the country, will thus hold a post of vantage, as compared with other wholesale grocers, in their dealings with the chains. They will hold a post of vantage in their dealings with others outside the chains. When they add groceries to meats, they will do so, they assure us, with substantially no increase of the existing overhead. Thus in the race of competition they will be able by their own admission to lay a handicap on rivals overweighted at the start. The opportunity will be theirs to renew the war of extermination that they waged in years gone by.

Sporadic instances of unfair practices even in the meat business are stated in the findings to have occurred since the monopoly was broken, practices as to which the defendants' officers disclaim responsibility or knowledge. It is easy to make such excuses with plausibility when a business is so huge. They become less plausible when the size of the business is moderate. Responsibility is then centered in a few. If the grocery business is added to the meat business, there may be many instances of unfair pressure upon retailers and others with the design of forcing them to buy from the defendants and not from rival grocers. Such at any rate was the rationale of the decree of 1920. Its restraints, whether just or excessive,

were born of that fear. The difficulty of ferreting out these evils and repressing them when discovered supplies an additional reason why we should leave the defendants where we find them, especially since the place where we find them is the one where they agreed to be.

There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

The case comes down to this: the defendants had abused their powers so grossly and persistently as to lead to the belief that even when they were acting separately, their conduct should be subjected to extraordinary restraints. There was the fear that even when so acting they would still be ready and able to crush their feebler rivals in the sale of groceries and kindred products by forms of competition too ruthless and oppressive to be accepted as fair and just. Wisely or unwisely, they submitted to these restraints upon the exercise of powers that would normally be theirs. They chose to renounce what they might otherwise have claimed, and the decree of a court confirmed the renunciation and placed it beyond recall.

What was then solemnly adjudged as a final composition of an historic litigation will not lightly be undone at the suit of the offenders, and the composition held for nothing.

The decree should be reversed and the petitions dismissed.                                                          *Reversed.*

The CHIEF JUSTICE, MR. JUSTICE SUTHERLAND and MR. JUSTICE STONE took no part in the consideration and decision of this case.

MR. JUSTICE BUTLER, dissenting.

The facts on which the District Supreme Court allowed modification of parts of the 1920 consent injunction are set forth in its findings prepared in accordance with Equity Rule No. 70½. They are discussed and amplified in a painstaking opinion contained in the record. I think they are sustained by the evidence and are sufficient to support the decree. .

Conditions affecting competition in the lines of business carried on by defendants have changed since 1920. Indeed, the Government, after the introduction of evidence by appellees, formally stipulated that they "are in active competition with each other " etc.[1]  The facts nega-

---

[1] Census figures in respect of slaughtering and meat packing establishments in 1921 and 1927 are as follows:

| Value of production per year: | 1921 | 1927 |
|---|---|---|
| $5,000 to $20,000 | 142 | 64 |
| $20,000 to $100,000 | 304 | 267 |
| $100,000 to $500,000 | 360 | 429 |
| $500,000 to $1,000,000 | 112 | 163 |
| $1,000,000 and over | 266 | 327 |
| Total | 1,184 | 1,250 |

The relations between each of the defendant packers' production of meat and lard and total production of these articles in the United States during the years 1920 and 1929 are as follows:

tive any suggestion that danger of monopolistic control now exists. Each of the principal packers has suffered discouraging operating losses. One of them, retiring from business, sold its plants to another. The purchaser, in order to avoid failure, was compelled to refinance and has not earned reasonable profits in any year. Another, being embarrassed, passed into the hands of a receiver, was subsequently adjudged bankrupt and later reorganized. Only two have continued able to sustain themselves. It is shown without dispute that defendants' earnings, whether considered in relation to sales or to the worth of property invested, are low and substantially less than those of others carrying on the same lines of business.[2]

Since 1920 the manufacture and distribution of food have grown greatly and to a large extent have come to

|  | 1920 | 1929 |
|---|---|---|
| Swift | 13.2% | 15.2% |
| Armour (including Morris) | 15.8% | 14.1% |
| Wilson | 5.2% | 4.3% |
| Cudahy | 4.0% | 4.7% |

[2] The following table groups the defendants' earnings and compares them with the combined earnings of 15 competitors from 1920 to 1929:

| Year | Percentage of defendants' earnings on sales | Percentage of competitors' earnings on sales | Percentage of defendants' earnings on net worth | Percentage of competitors' earnings on net worth |
|---|---|---|---|---|
| 1920 | 0.18 | 0.76 | 0.88 | 2.48 |
| 1921 | a 3.05 | a .17 | a 10.27 | a 5.80 |
| 1922 | .10 | 2.72 | .35 | 10.87 |
| 1923 | 1.58 | 3.40 | 5.65 | 12.00 |
| 1924 | 1.77 | 3.39 | 6.46 | 13.28 |
| 1925 | 1.44 | 2.03 | 5.82 | 9.11 |
| 1926 | 1.35 | 2.65 | 5.03 | 12.24 |
| 1927 | .63 | 2.07 | 2.49 | 9.83 |
| 1928 | 1.24 | 3.17 | 5.13 | 14.10 |
| 1929 | 1.06 | 2.68 | 4.55 | 14.02 |

a Loss.

be carried on by integrated concerns in strong hands, which have taken over and are handling many products from the sources of production to consumers. More and more, meat—formerly distributed through shops selling little if anything else—is sold in stores carrying groceries and other articles of food. The diversification of the business of defendants permitted by the modification of the injunction is in harmony with present legitimate tendencies in the business of producing and selling meat, groceries and other articles of food. In all branches of such activities there is strong and active competition. The use by defendants of their employees and facilities for the sale and distribution of groceries as well as meat would not give them any undue advantage over their competitors. Under present conditions the relief granted below would not enable them to inflict the evils of monopoly upon any part of the food industry. The denial of that relief makes against competition intended to be preserved by the Sherman Act. Defendants should be permitted more efficiently to use their help and equipment to lessen their operating expenses. That makes for lower prices and so is in the public interest.

The wholesale grocers, represented here by objecting interveners, are not entitled to the court's protection against the competition of non-members or of defendants carrying on separately and competing actively. They may not avoid the burden of sustaining themselves in a free and open market by protestation of fear that, if allowed to engage in the grocery business at all, defendants will unfairly compete in violation of the federal antitrust laws. If and whenever shown necessary for the protection of the commerce safeguarded by the original decree, the Government may have the modified provisions restored or new ones added.

There is nothing in the original complaint that makes for reversal here. The Government's allegations were denied by answer. The decree was entered without evi-

dence or findings pursuant to a written stipulation between the Government and the defendants expressly providing that "this stipulation shall not constitute or be considered as an admission, and the rendition or entry of the decree, or the decree itself, shall not constitute or be considered as an adjudication that the defendants, or any of them, have in fact violated any law of the United States." And that provision was in exact words incorporated in and made a part of the decree. Thus the Government consented to, and the court adopted, this provision quite as much as the defendants consented to the other parts of the decree.

The fact that defendants thereafter applied to have the decree vacated upon grounds directed only to the power of the court to enter it ought not to be regarded as militating against them or their good faith—particularly when it is recalled that this court, when reviewing that proceeding, deemed the questions presented of sufficient importance to call for their argument a second time. 276 U. S. 311.

I am of opinion that the facts found, taken with those conceded or established by uncontradicted evidence, justly entitle appellees to the measure of relief given below, and that the modifying decree should be affirmed.

I am authorized to say that MR. JUSTICE VAN DEVANTER concurs in this opinion.