THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v. GEORGE F. SCANLON, Individually and Doing Business as SLOAT AND SCANLON, Respondent.—

Even if it be assumed, in the light of the decision rendered by the Court of Appeals when it dismissed the appeal from our prior order (6 N Y 2d 185), that the Special Term in the exercise of its discretion is empowered to amend or modify the judgment as distinguished from vacating it, we believe, nevertheless, that the Special Term improvidently exercised its discretion in amending the judgment so as to permit defendant to resume his activity as a stockbroker. The only reason for the amendment was that defendant's conduct since the entry of the judgment in 1939 had been ethical, exemplary and above reproach. In our opinion, this was an inadequate basis for the amendment. We do not think the Legislature ever intended that a consent judgment rendered under the Martin Act should be *vacated* or *dissolved* or *modified* or *amended* merely because of the defendant's subsequent good conduct. The Martin Act is not directed toward the punishment

of offenders but rather to the protection of the public. Once the defendant has consented to a permanent injunction of certain activities for the protection of the public the People should not be called upon at intervals to justify its continuance (cf. *People* v. *Durkin,* 191 Misc. 341; *People* v. *Haynes,* 2 Misc 2d 983; *Enterprise Window Cleaning Co.* v. *Slowuta,* 299 N. Y. 286). Nolan, P. J., Beldock and Ughetta, JJ., concur; Kleinfeld, J., not voting; Pette, J., dissents and votes to affirm the order amending the judgment, with the following opinion: In my opinion, the position taken by the majority is inconsistent. If it be conceded, as it is by the majority, that the courts do possess the power to amend or modify an outstanding decree of permanent injunction, there was no abuse of discretion in this case because there were specific conditions shown which warranted such relief. It is unchallenged that the defendant's course of conduct since the 1939 entry of the decree herein has been praiseworthy. In fact, on the prior appeal in this court a finding was made, which the prior record supported, that "since the issuance of the injunction his [defendant's] conduct has in all respects been meritorious and exemplary and discloses that the existence of the injunction has been and is working some hardship on him and his family" (*People* v. *Scanlon,* 7 A D 2d 648). In addition thereto, on the present record it is undenied: (a) that the defendant has thoroughly rehabilitated himself from whatever position of technical insolvency he was accused in 1939; and (b) that all of his then creditors or customers, largely relatives or friends, have been more than made whole. It further appears that defendant's 1939 difficulties stemmed from the fact that he had been largely dealing in public utility stocks which were then declining in market value. These same stocks, in the past two decades, have attained investment stability and market enhancement which presently justify the defendant's previous activity and the involvement of his customers in such securities on the theory that they were of sound character and good investment value. We could almost take judicial notice of the fact that today public utility stocks are regarded as "blue chips" or their equivalent, and that the case at bar is not the usual one where securities of the so-called "cat and dog" type were palmed off by the unscrupulous dealer who usually gets caught in the net of the Martin Act. Under these circumstances, there is present an affirmative and undisputed showing of changed conditions which warranted the exercise of the learned Special Term's discretion on the instant motion. In connection therewith, it is to be noted that, unlike this court's holding on the previous appeal, the majority of the court is not now holding that section 528 of the Civil Practice Act erects a two-year Statute of Limitations in which period of time a corrective motion on an outstanding judgment must be made. It is assumed that the majority now accepts the general proposition that no time limitation contained in a practice act can be deemed a curtailment of the inherent power of a court to open its judgment "for sufficient reason, in the furtherance of justice" (*Ladd* v. *Stevenson,* 112 N. Y. 325, 332; *Clark* v. *Scovill,* 198 N. Y. 279, 286). It appears that the majority now rest their decision upon the ultimate position that a consent judgment rendered under the Martin Act must necessarily operate in perpetuity because considerations of public protection necessitate that the People should not be required to justify the continuance of the outstanding injunction, no matter how unfair to defendant subsequent developments show it to be. Two of the authorities cited by the majority for this proposition (*People* v. *Durkin,* 191 Misc. 341; *People* v. *Haynes,* 2 Misc 2d 983) are not, in my opinion, decisive of the question as to whether a Martin Act decree is to last forever. The *Durkin* case turned essentially upon the view that section 528 of the Civil Practice Act precluded relief after the lapse of two years; and the *Haynes* case was decided in large measure upon the authority of the *Durkin* case. Both of these cases

were cited to the Court of Appeals on the appeal from this court's prior determination (*People* v. *Scanlon,* 6 N Y 2d 185, 187). Notwithstanding their invocation, in my view they were both inferentially rejected by our highest tribunal since that court in its *Per Curiam* opinion (*People* v. *Scanlon, supra,* p. 188) cited the specific case of *Enterprise Window Cleaning Co.* v. *Slowuta* (299 N. Y. 286) as precedent for the proposition that a motion to "amend" a previous final determination, which is granted at Special Term and denied in the Appellate Division, results in an order final in character which is reviewable in the Court of Appeals. Like the learned Justice at Special Term who granted defendant's instant application upon the inference fairly to be drawn from the Court of Appeals' citation of the *Enterprise* case, I am of the opinion that such citation involved more than a reference to a procedural matter. It can only be viewed as authority for the substantive proposition that a defendant's application to "amend" a permanent injunction, entered on consent, falls within the orbit of the power of a court of equity to correct its own judgment as subsequent "events may shape the need for such relief" (10 Carmody-Wait, New York Practice, § 110, p. 750). The view that the citation of the *Enterprise* case by the Court of Appeals augured the propriety of an application to "amend" the instant permanent injunction is founded on a consideration of what was therein substantively involved. In the *Enterprise* case the Court of Appeals considered an appeal from an order denying appellant's application "to modify an injunction entered by consent many years ago" (299 N. Y. 286, 288). Some 15 years prior to this application, in an action brought by two window cleaning corporations against a window cleaners' union, a permanent injunction against the union, restraining mass picketing, had been entered on consent. On the union's motion to vacate the injunction, Special Term modified the outstanding decree to the extent of eliminating any restraint therein against the peaceful picketing of the premises of plaintiff's customers. The Appellate Division, First Department, reversed the order entered at Special Term, with Mr. Justice SHIENTAG dissenting. In affirming, the majority of the Court of Appeals wrote, insofar as presently pertinent (*Enterprise Window Cleaning Co.* v. *Slowuta,* 299 N. Y. 286, 288) : "the question posed is exceedingly narrow: whether the court below has abused its discretion in denying the application. The modification of an injunctive decree must rest upon a clear showing that the evils which justified the prohibition have vanished. No such proof is disclosed by this record. On the contrary, it is undisputed that violence and assault recurred many years after entry of the decree. Defendant did not prove — indeed did not undertake to prove — that 'dangers, once substantial, have become attenuated to a shadow' (*United States* v. *Swift & Co.,* 286 U. S. 106, 119). In those circumstances we cannot hold that the Appellate Division has abused its discretion, or that the rights of the union's members under the Federal Constitution have been violated (*Milk Wagon Drivers' Union* v. *Meadowmoor Dairies,* 312 U. S. 287, 296)." In the *Enterprise* case, Judge DESMOND dissented and voted to "modify" the 15-year-old injunction in accordance with the result obtained at Special Term (p. 289). Judge DESMOND asked the rhetorical question, "How long must this union stay on probation?", and took the position, contrary to the majority view, that the record justified the conclusion that the defendant union for at least 10 years had been guilty of no violation of public order or propriety (p. 290). In effect, therefore, in the *Enterprise* case, it was made clear that the Court of Appeals plainly accepted the principle that a court of equity has the inherent power to "modify" an outstanding order of injunction as a matter of discretion. The majority and minority merely disagreed on whether the operative facts there adduced amounted to a convincing showing of such a change of circumstances as justified ameliorative

relief by a court of equity. The case of *United States* v. *Swift & Co.* (286 U. S. 106), cited by the majority in the *Enterprise* case, was a case where the United States Supreme Court likewise split on the question of whether the facts shown were sufficient to move the discretion of a court of equity in easing the burden of an outstanding Sherman Antitrust Act injunction, entered by consent. Writing for the majority, Mr. Justice CARDOZO stated (pp. 115, 119): "The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be. * * * Life is never static, and the passing of a decade has brought changes * * *. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." In the *Swift* case, Justice CARDOZO and the majority held that the defendants had failed to demonstrate facts sufficient for their relief while Justices BUTLER and VAN DEVANTER held that the right to relief was sustained by the evidence (p. 120). Thus, the principle of modification of an existing injunctive decree was there reaffirmed, the Justices merely disagreeing on whether the facts warranted the relief which all agreed a court of equity could grant. Since the *Swift* case, the United States Supreme Court has even gone further in this type of case. Mr. Justice FRANKFURTER, speaking for the majority, has written (*Drivers Union* v. *Meadowmoor Co.*, 312 U. S. 287, 298): "The injunction which we sustain is 'permanent' only for the temporary period for which it may last. It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted." The doctrine implicit in the *Enterprise, Swift* and *Drivers Union* cases is now accepted as authority for the proposition that a court of equity possesses inherent power to alter its decrees "where there has been a change of circumstances which would make continued enforcement of the injunctive process inequitable, oppressive and unjust or in contravention of the policy of the law" (*Dictograph Prods.* v. *Empire State Bureau,* 4 A D 2d 508, 510). It is to be noted that in the *Swift* case, there was involved the Sherman Antitrust Act, a statute akin to the Martin Act herein involved, in that it was designed to protect the public interest. Yet the United States Supreme Court held that an injunction entered thereunder on consent, as at bar, was subject to the power of change vested in a court of equity, when the factual pattern of the particular case warranted such relief. The Martin Act at bar, like the Sherman Antitrust Act, in none of its terms mandates that a judgment rendered thereunder, whether by consent or otherwise, shall necessarily operate in perpetuity. Hence, it clearly appears to be erroneous to hold, as do the majority of this court, that a Martin Act injunction must be deemed outside the ambit of the power of a court of equity to correct because to do so would be inimical to public policy. In my view, the Martin Act injunction falls within the same pattern of public policy which inheres in the Sherman Antitrust Act. I would, therefore, hold that a decree under the Martin Act, like any other judgment of a court of equity, although it was proper and was responsive to the needs that existed at the time of its entry, should not be prolonged when "its continuance is no longer warranted, and * * * its enforcement, in view of the change of circumstances, will effect an injustice" (*Dictograph Prods.* v. *Empire State Bureau, supra,* p. 510).

In my opinion, the record at bar adequately demonstrates changed circumstances showing that the 1939 injunction is no longer justly operative and that it has become an unnecessary instrument of oppression. It must also be noted that the instant action, though framed under the Martin Act, was one originally brought as a typical suit in equity, the complaint alleging that the plaintiff People had no adequate remedy at law. The complaint also charged that defendant failed to keep a proper set of books and records concerning his transactions in the sale of securities. It also charged that the defendant had engaged in fraudulent practices in the sale of securities. Nevertheless, the defendant's consent to the judgment of injunction in 1939 was on the express statement that he did not thereby admit to any fraud in the purchase or exchange of securities or any of the allegations contained in the complaint. We therefore have a judgment of permanent injunction by a court of equity which the majority holds must be effective forever, even though it does not rest upon any original finding or admission of fraud. It is important to note further that the outstanding injunction permits defendant to engage in the securities business as a salesman or as an employee of any registered or reputable dealer or broker, and that the amendment sought by the defendant, which the Special Term has granted and the majority holds must be annulled, would merely permit him to further engage in such activities as a "partner, general or special" in a registered or reputable stock brokerage firm, without otherwise impairing the original judgment. On the present record, it appears that under the prevailing rules of the New York Stock Exchange a member suspended for insolvency may be reinstated after having settled with his creditors. In effect, the Special Term at bar accorded the same measure of impermanent punishment to the defendant as would have been meted out to him, were he a member, by the highly reputable New York Stock Exchange which is, of course, concerned with protection of the public. If defendant was trusted to deal in securities with the public as an agent when he was in an alleged fallen position, it is difficult to perceive why he should not be permitted to transact the same business as a principal, now that his standing has been cleared. In sum, it is my view that the record at bar clearly indicates "that the evils which justified the prohibition have vanished" (*Enterprise Window Cleaning Co.* v. *Slowuta, supra,* p. 288). The statute on which the injunction here rests is silent as to whether the prohibition shall endure forever. Such permanence ought not to be read into a statute in the absence of expression of a clear legislative intent to curtail the historic powers of a court of equity. Factors are present which, in any other type of permanent injunction case, concededly would lead a court, in the exercise of discretion, to lift the bar of an outstanding decree of prohibition. Moreover, it seems to me that the defendant is practically in the same position as a lawyer who has been disbarred for professional misconduct. Nothing in the disbarment statute (Judiciary Law, § 90) declares that a disbarred attorney may never regain his former status. Nevertheless, even in matters of that kind, where elements of public protection are most definitely present, the courts have been willing to readmit to good standing as a member of the Bar one whose previous conduct brought on the extreme penalty of disbarment but whose subsequent conduct manifested honorable deportment and rehabilitation of character (*Matter of Newell,* 208 App. Div. 496; *Matter of Stern,* 275 App. Div. 769; *Matter of Crosby,* 285 App. Div. 859; *Matter of Haas,* 11 A D 2d 791). In my opinion, nothing in the Martin Act precludes the same measure of compassion for a securities dealer who deviates once from the prescribed standards of his calling. The whole notion that one who commits a single infraction is beyond future redemption and salvation seems abhorrent to prevailing norms of justice and fairness and even religion. It seems to me that the principles

which guide a court of equity are sufficient to protect the public interest under the Martin Act. For the reasons stated, the order under review should be affirmed.