868 P.2d 1284

**Charles BARNES, Petitioner–Appellant/Cross–Appellee,**

v.

**Gail SHOEMAKER, Respondent–Appellee/Cross–Appellant.**

**No. 14896.**

Court of Appeals of New Mexico.

Dec. 21, 1993.

Certiorari Denied Feb. 4, 1994.

---

William A. L'Esperance and Marcella M. Neville, Albuquerque, for petitioner-appellant/cross-appellee.

Sanford H. Siegel, Atkinson & Kelsey, P.A., Albuquerque, for respondent-appellee/cross-appellant.

*OPINION*

HARTZ, Judge.

The decree dissolving the marriage of Husband and Wife ordered Husband to make monthly payments of $600 to Wife beginning when he reached age 55. These periodic payments represented her community share of his retirement benefits. As we construe the decree, the district court did not retain jurisdiction to modify the monthly-payment award. More than a decade later Husband sought a modification of the decree as to future payments on the ground that "it is no longer equitable that the judgment should have prospective application." SCRA 1986, 1–060(B)(5) (Repl.1992). We hold that when, as here, the sole ground urged for the modification is that the original award was based on an erroneous projection of the value of the retirement benefits, such a modification is improper unless the reason for the error in the projection is a circumstance that the party seeking relief had no opportunity to foresee or control. We therefore reverse the district court order modifying the original decree.

## I. BACKGROUND

We decide this appeal on our summary calendar. We accept as true the uncontested representations of fact in the docketing statements filed by the parties. *See State v. Calanche*, 91 N.M. 390, 392, 574 P.2d 1018, 1020 (Ct.App.1978). Husband and Wife were married in Michigan in 1956. In 1967 they moved to Albuquerque so that Husband could accept a position with Sandia National Laboratories (Sandia). Husband filed for divorce in 1980. After a one-day trial in which the only witnesses were Husband, Wife, and an economist who provided expert testimony on the value of Husband's Sandia retirement plan, the district court entered a final decree on April 28, 1981. The decree valued and divided the Sandia retirement benefits, the couple's residence, and other community as-

liquids and failure to guard machinery. The citation also mentioned certain violations that related to respirators and worker education re-

garding hazardous chemicals, but these were labeled "other than serious" and resulted in no fine to Defendant.

sets. It also determined child support and awarded alimony to Wife. Neither party filed any post-trial motions or appealed the decree. The references in the decree to the Sandia retirement plan are as follows:

6. [Husband] shall take as his sole and separate property the following:

. . . .

G. His accrued retirement benefits at Sandia Laboratories, subject to [Wife's] community property interest in said benefits as set forth in Paragraphs 12 and 13 below.

. . . .

12. [Wife] shall take as her sole and separate property her one-half interest in [Husband's] accrued retirement benefits in the following manner: Upon attainment of age fifty-five (55) by [Husband], [Husband] shall begin paying [Wife] $600.00 per month, the first such payment due and owing to [Wife] August 1, 1992, and $600.00 the first of each and every month thereafter until the death of [Husband]. These payments shall be paid to [Wife] whether or not [Husband] retires at age fifty-five (55), and whether or not [Husband] continues employment with Sandia Laboratories.

13. The Court reserves jurisdiction to enforce payment by [Husband] to [Wife] of [Wife's] present one-half community property interest in [Husband's] accrued retirement benefits.

. . . .

18. Additionally, [Husband] shall maintain life insurance coverage on his life, in at least the amount of $45,000.00, until the death of [Wife], naming [Wife] as beneficiary, to ensure receipt by [Wife] of her present one-half community interest in [Husband's] retirement benefits.

After the divorce Husband continued to work at Sandia for another four years and four months, when he left to take a job in California. Husband then filed suit to terminate the alimony awarded to Wife in the original decree. After negotiations between the parties, a stipulated order entered in April 1987 terminated alimony. The retirement plan was not addressed in the pleadings in that suit.

This appeal arises from Husband's "Petition To Equitably Divide Retirement And Relief From Judgment Or Order Pursuant to Rule 1–060.B.(5)," filed on July 10, 1992. Husband alleged that in the original action the parties had attempted to project what Husband's monthly retirement benefit would be upon early retirement at age 55 and that insufficient information led to an inaccurate projection that Husband's benefit would be $1200 per month. Husband further alleged that he had been informed that he was not eligible for early retirement benefits at age 55 and that when he could begin drawing his pension at age 65 (in August 2002) his monthly allotment would be $806.49. He concluded that "it would no longer be equitable that the Final Decree of Divorce have prospective application based on the facts and circumstances surrounding the value and commencement date of [Husband's] retirement and pursuant to Rule 1–060B.(5), the Court should enter its Order relieving [Husband] of his obligation to pay [Wife] the sum of $600 per month as her ½ of his Sandia Labs retirement." Husband sought to delay the monthly payments until August 2002 and to reduce them to somewhat less than half of $806.49. In the alternative, he sought a Qualified Domestic Relations Order awarding Wife her community property interest in his retirement fund. *See Ruggles v. Ruggles,* 116 N.M. 52, 55 n. 3, 860 P.2d 182, 185 n. 3 (1993) (describing Qualified Domestic Relations Orders).

Among the district court's findings were the following:

12. When Husband resigned from Sandia Laboratories in August, 1985, he did so voluntarily and with knowledge that his resignation 19 months before his 20th employment anniversary would result in the elimination of the option to receive retirement benefits at age 55. Husband's testi-

mony suggested an attitude of disdain toward the benefits. He testified that he responded to a colleague who counseled him about the negative impact of resigning 19 months early:

"I've never believed in retirement benefits. They are golden handcuffs ... I've never paid much attention to retirement benefits, and I've been repulsed by those who did."

13. Husband did not discuss his plans to change employment or the impact a change would have on the retirement benefits with Wife.

14. In August, 1985, Husband withdrew $11,456.53 from the Sandia Laboratory Retirement plan which was made up of $6,409.57, contributions made before the plan became a non-contributory plan, and $5,046.96 in interest accrued on the contributions. Husband did not discuss this withdrawal with Wife nor did he share the money with her. The money was community property.

15. In 1987, Sandia Laboratories sent Husband a waiver form which addressed survivor benefit options and gave notice that unless Husband made an affirmative decision about survivor benefits, an option would be selected for him by Sandia Laboratories and the pension would be reduced by the cost of survivor benefits. Husband did not discuss this information with Wife, and he did not affirmatively respond to Sandia Laboratories.

16. Husband did not provide Wife with information as to what survivor benefits options were available or what the costs were. It appears Husband selected a survivor benefit option by default, by failing to respond to the notice.

17. The Sandia Laboratory Retirement plan provides that if early retirement (age 55) is elected, the monthly benefit is reduced to 35% of the monthly benefit available at age 65.

18. The parties were married 25 years during which [W]ife worked as a waitress in the early years and later as primary parent to the parties' three children. She held a high school diploma and obtained an LPN at TVI in 1973. Husband during the marriage obtained a B.S., M.S. and Ph.D. in engineering. That is, while Husband may hold retirement benefits in low regard, the importance of the benefits to [W]ife is great.

19. Husband's testimony and other evidence as to the monthly retirement benefits that might have been available had he:

a) worked a full 20 years before resigning,
or
b) worked to age 55 before resigning, or
c) worked to age 65 before retiring

were unreliable

(i) because the projected annual salary increases he used were not in line with his actual annual salary increases either at Sandia Laboratories or at his subsequent places of employment, and

(ii) because of the unknown impact of the $11,456.53 he withdrew in 1985, and the survivor benefit option he made in 1987.

20. It appears that if Husband had continued to be employed at Sandia Laboratory until 2002 when he reached age 65, Wife's share, which then would have been 23.3%, would have been $600 monthly, or perhaps more. However, because of the 65% discount assessed against the benefits for early retirement it would have been impossible for Wife's share to be $600 monthly at Husband's age 55 no matter how meticulously he might have managed the retirement benefit asset with an eye toward maximizing Wife's interest in it.

The district court entered the following conclusions of law:

B. Husband had a fiduciary duty to manage the retirement benefit asset in a manner that advanced Wife's best interests.

C. Husband breached that fiduciary duty, and his breach diminished the value of the retirement benefit asset.

D. Husband alone should suffer the diminished value of the retirement benefit asset, and Wife's options should be restored to her as though Husband has not breached his fiduciary duty.

E. Husband had the burden of proof to show that it would be inequitable that the 1981 final decree should have prospective application. He met that burden of proof, but he failed to show how the consequences of his breach of fiduciary duty could be remedied.

F. It is appropriate to set aside the portion of the 1981 Final Decree that divides the retirement benefits because retirement benefits are a hybrid asset, being partially property and partially future stream of income. To the extent retirement benefits are future income, they are speculative. The trial court in 1981, could only predict the value of this asset because the value depended on length of service, wages and other factors not knowable in 1981.

G. Wife should have the option of selecting from the following remedies:

i) Wife will receive from Husband the maximum amount of retirement benefits that could have been available to her upon Husband's 55th birthday if Husband had managed the retirement asset properly. The amount may be determined assuming;

—Husband remained employed at Sandia Laboratories until his 55th birthday;

—Husband retired on his 55th birthdate;

—Husband did not withdraw the community contributions and accrued interest unless it was mutually advantageous to do so; and

—Wife selected the survivor benefit package most advantageous to her.

This sum should be paid directly by husband until his 65th birthdate at which time [W]ife may choose to have the sum paid to her directly by Sandia Laboratories Retirement Plan or to have the sum continue to be paid by [H]usband.

–OR–

ii) Wife will receive $600 monthly of the $806.49 retirement benefit, upon [H]usband's 65th birthday. Wife may choose whether to have the sum paid directly by Sandia Laboratories Retirement Plan or to have the sum paid by Husband.

H. A determination shall be made with respect to what Wife's share of the $11,-456.53 which Husband received in August, 1985, would be at the current time, and whether she should now receive her share or whether an off-set is appropriate against the $600 monthly [W]ife has received since August, 1992, pursuant to this Court's December, 1992, Order, or if a different solution is appropriate.

I. The Court is specifically not ruling that it was Husband's fiduciary duty to continue his employment until his 65th birthday to maximize Wife's share of retirement benefits. The court also is not determining what the maximum extent of an employee-spouse's duty is with respect to managing post-divorce, jointly-owned retirement benefits. The court only determines that this Husband's conduct with respect to managing these post-divorce, jointly-owned retirement benefits constituted a breach of his fiduciary duty.

## II. DISCUSSION

### A. Meaning of the Original Decree

■ First, we address the nature of the award of periodic payments to Wife in the original decree. Husband contends that the original decree merely awarded Wife her community interest in the retirement benefits and retained jurisdiction in the district court to adjust the monthly payments in accordance with future developments. If Husband is correct in this regard, then the district court would have relatively broad

discretion to modify the award in the light of changed circumstances. On the other hand, if the original decree did not continue jurisdiction in the district court to adjust the monthly payments, then modification would be proper only on one of the grounds set forth in SCRA 1–060(B).

In support of his position Husband refers to (1) the language in paragraph 13 of the decree which "reserves jurisdiction to enforce payment by [Husband] to [Wife] of [Wife's] present one-half community property interest in [Husband's] accrued retirement benefits," (2) the language in paragraph 18 that requires Husband to maintain life insurance "to ensure receipt by [Wife] of her present one-half community interest in [Husband's] retirement benefits," and (3) the language in paragraph 6G that awards to Husband as separate property his accrued retirement benefits "subject to [Wife's] community property interest in said benefits as set forth in Paragraphs 12 and 13 below."

We disagree with Husband's construction of the decree. There would be little purpose in the decree's setting a figure of $600 per month if the figure actually to be paid could be determined only at the time that payment was to begin. More importantly, paragraph 12 of the decree states, "These payments shall be paid to [Wife] whether or not [Husband] retires at age fifty-five (55), and whether or not [Husband] continues employment with Sandia Laboratories." This language clearly evinces a purpose of setting a fixed monthly payment regardless of contingencies affecting the value of Husband's retirement plan.

The language relied upon by Husband can readily be explained. First, Paragraph 13, rather than supporting Husband's position, actually supports the contrary construction of the decree. It does not reserve jurisdiction to *recompute* the amount of the payment but to *enforce* payment. *See Mendoza v. Mendoza*, 103 N.M. 327, 333, 706 P.2d 869, 875 (Ct.App.1985) (noting distinction between power of trial court to modify judgment and power to enforce judgment).[1] Second, the appearance in paragraphs 13 and 18 of the language "present one-half community interest in [Husband's] retirement benefits" can best be understood as a shorthand reference to the award described in paragraph 12 rather than as an indication that the value of the community interest was still to be determined. In paragraph 6G the decree makes this explicit when it refers to Husband's "community property interest in said benefits as set forth in Paragraphs 12 and 13 below."[2] There was no need for the decree to repeat the limiting language "as set forth in paragraph 12" after each subsequent reference to the community interest in the retirement benefits.

Husband submitted a proposed finding that refers to the existence of parol evidence indicating that the original decree was intended to reserve jurisdiction in the district court to modify the amount of the required monthly payments. The district court, however, did not adopt the proposed finding. *See Gallegos v. Wilkerson*, 79 N.M. 549, 551, 445 P.2d 970, 972 (1968) (failure to make requested finding is held to be finding against party with burden of proof). That rejection of the proposed finding is further evidenced by the district court's Conclusion E, which demonstrates that the court was granting relief under Rule 1–060(B)(5) rather than on the ground that the original decree granted the court continuing authority to adjust the amount of the monthly benefit.

In any event, regardless of the district court's construction of the original decree, we find the decree to be unambiguous in awarding a fixed periodic payment from Husband to Wife. The decree does not contemplate a future recalculation of the parties' interests

1. Of course, even when the court does not reserve jurisdiction to modify a judgment, the judgment can be set aside or modified when a ground set forth under Rule 60(B) applies. *See Mendoza*, 103 N.M. at 331–32, 706 P.2d at 873–74.

2. The purpose of the reference to paragraph 13 is unclear since the benefits are set forth only in paragraph 12. The reference may be an artifact from an earlier draft of the decree.

in the retirement benefits. Thus, Husband could obtain a modification of the award only pursuant to Rule 1–060(B).

### B. Application of Rule 1–060(B)(5)

■ Husband based his petition for modification solely on Rule 1–060(B)(5), which permits relief from a judgment when "it is no longer equitable that the judgment should have prospective application." We agree with Husband that the district court had jurisdiction to consider his petition. The question is whether the circumstances present here justify a modification of the award in the original decree.

The only justification for modifying the decree that is apparent from the district court's order is that the value of the periodic payments awarded by the decree exceeds by a substantial amount what Wife's share of Husband's retirement benefits would actually have turned out to be, even if Husband had always taken care to protect Wife's interest in maximizing those benefits. In other words, the modification is justified by the inaccuracy of the prediction in the original decree. We assume that the error did not result from a misconception of facts (such as the terms of the Sandia retirement plan) that existed at the time of the original decree. If it did, correction of the error would be possible only under SCRA 1–060(B)(1) (relating to mistake or excusable neglect) or SCRA 1–060(B)(2) (relating to newly discovered evidence), both of which grounds must be invoked within one year of the decree. *See* SCRA 1–060(B); *Parker v. Parker,* 92 N.M. 710, 594 P.2d 1166 (1979); *Parks v. Parks,* 91 N.M. 369, 371, 574 P.2d 588, 590 (1978). Thus, relief here could not rest on any such cause of the error. The error must have arisen from post-decree events.

Not long ago we expressed the view that judgments should not be set aside because of post-trial events that are "material solely to undermine the predictions of experts at trial relating to damages." *Fowler–Propst v. Dattilo,* 111 N.M. 573, 577, 807 P.2d 757, 761 (Ct.App.), *cert. denied,* 111 N.M. 678, 808 P.2d 963 (1991). In *Fowler–Propst* the plaintiffs had sued for misrepresentation and professional negligence relating to the sale of a house that turned out to have an inadequate water well. The jury returned a verdict for the plaintiffs, finding that the house was worth about $70,000 less than it would have been worth with a proper well. Less than three months after the trial the plaintiffs sold the house for a price greater than what they had paid for it and much greater than the value estimated by their witnesses at trial. The defendant filed a motion pursuant to SCRA 1–060(B)(2) requesting that the judgment be set aside on the ground of newly discovered evidence that demonstrated that the plaintiffs had suffered no damage. The district court granted a new trial. We reversed, explaining:

> When witnesses value an item of property, they are in essence predicting what a willing buyer would pay a willing seller. Everyone at trial knows that the testimony consists of estimates. Everyone knows that the estimates may be wrong, even quite wrong. No one expects the trial to be put off until the occurrence of some definitive event that establishes damages with certainty. Nevertheless, all expect the trial to end the controversy.

*Id.* at 577, 807 P.2d at 761.

Although *Fowler–Propst* was decided under Rule 1–060(B)(2), relating to newly discovered evidence, rather than under Rule 1–060(B)(5), which permits a modification of a judgment when "it is no longer equitable that the judgment should have prospective application," the underlying rationale applies here. The judgment in both cases rested on a prediction relating to the value of an item of property. In *Fowler–Propst* the prediction concerned what a willing buyer would pay a willing seller for a piece of real estate. In this case the prediction related to the value of a retirement plan eleven years in the future. Both predictions were fraught with uncertainty. The prediction in *Fowler–Propst* proved to be very wrong only three months later. The prediction here apparently also was wrong. Yet at the trial leading to

the original decree the parties necessarily realized that the prediction regarding the value of the retirement plan was dependent on assumptions that could turn out to be quite inaccurate. The value of the plan would be affected by a number of uncertainties, including the future inflation rate and Husband's promotions at his job. The purpose of having an economist testify at the original trial was to assist the court in making an intelligent estimate regarding these uncertain matters. The court could have postponed its evaluation of the retirement plan, waiting perhaps until Husband was 55; but it did not. The decree was intended to end any controversy regarding the amount of the periodic payments, even though the award might turn out to be based on inaccurate estimates.

We have not found any published opinion discussing whether a party in a divorce action can obtain modification of future periodic payments arising from a property settlement on the ground that factual developments render the originally ordered payment schedule no longer equitable. Pertinent authority, however, suggests that such modification should be granted either not at all or only in extraordinary circumstances.

Some authority indicates that modification would never be appropriate. For example, the commentary to Restatement (Second) of Judgments § 73(2) (1980), which is the same in substance as the pertinent language of Rule 1–060(B)(5), could be read to suggest that this provision was not intended to affect a judgment such as the one here. Comment b states: "[I]f the controversy concerned ownership claims to specific property and the judgment determined the parties' interests in the property, a modification would amount to an improper redetermination of those interests."

To the same effect, decisions interpreting Federal Rule of Civil Procedure 60(b)(5), which is essentially identical to Rule 1–060(B)(5), hold that the rule should not be applied to set aside a money judgment. *Kock v. Government of Virgin Islands*, 811 F.2d 240, 244–45 (3d Cir.1987) (Rule 60(b)(5) cannot apply to a final money judgment having conclusive effect); *Marshall v. Board of Educ.*, 575 F.2d 417 (3d Cir.1978) (Rule 60(b)(5) does not apply to money judgment for past wrongs, which is inherently final); *Ryan v. United States Lines Co.*, 303 F.2d 430, 434 (2d Cir.1962) (Rule 60(b)(5) does not cover a judgment for money damages); *cf.* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2863, at 205 (1973) (Rule 60(b)(5) does not apply to judgments "that offer a present remedy for a past wrong"). Although these authorities involve only a single payment, one could argue that there is no persuasive reason to treat differently a present award for what amounts to a well-defined annuity. Instead of entering the decree here, the district court could have accomplished substantially the same result by ordering Husband to purchase (with a single payment) an annuity for Wife (assuming, of course, that Husband could afford the payment at the time).

On the other hand, the decree orders periodic future payments. It thus seems more natural to characterize it as having "prospective application" so that it is subject to Rule 1–060(B)(5). Yet even if the decree is so characterized, the case law suggests that obtaining relief is reserved for extraordinary circumstances. Because of the reliance interest in judgments having prospective application [3] and the virtues of finality, courts have set a high threshold for the extent of inequity required to justify prospective modification of a judgment. In the leading decision on the subject, Justice Cardozo wrote, "[The defendants] are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unfore-

---

3. We note that in this case Wife may have substantially relied on the assumption that she would be receiving $600 a month as required by the original decree. In fact, she contended in district court that she consented in 1987 to termination of alimony on the assumption that she would be receiving the $600 monthly payments.

seen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *United States v. Swift & Co.*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932); *see Elser v. I.A.M. Nat'l Pension Fund*, 579 F.Supp. 1375, 1382 (C.D.Cal.1984) (Court does not increase interest rate on pension because of failure to show that party "is suffering hardship so extreme and unexpected that it constitutes oppression.").

Central to the inequity inquiry is the extent to which developments since the original judgment have been "unexpected," *see Elser*, or "unforeseen," *see Swift & Co.* We agree with the Ohio Supreme Court that Rule 1–060(B)(5) "was designed to provide relief to those who have been prospectively subjected to circumstances which they had no opportunity to foresee or control." *Knapp v. Knapp*, 24 Ohio St.3d 141, 493 N.E.2d 1353, 1357 (1986); *see Bigelow v. Twentieth Century–Fox Film Corp.*, 183 F.2d 60, 62 (7th Cir. 1950) (must show "changed conditions not readily foreseeable at the time the decree was entered"); *In re Marriage of Jones*, 180 Ind.App. 496, 389 N.E.2d 338, 341 (1979) (must show change was not "reasonably foreseeable").

■ We conclude from these authorities that when a judgment is founded on a prediction that takes into account various contingencies, equity does not require modification of the judgment simply because events did not evolve in accordance with the prediction. A change in condition sufficient to justify modification of the decree must derive from a circumstance that could not have been foreseen at the time of the decree. There is no inequity in sticking with the valuation of the property in the original decree, as opposed to continuing to adjust that decree as new information suggests a modified valuation. The parties are entitled to repose rather than a never-ending series of adjustments. "[T]hat the case might be decided differently today is not a sufficient ground for vacating a judgment under Rule 60(b)." *Morris v. Travisono*, 499 F.Supp. 149, 157 (D.R.I.1980).

We point out that this limitation on the prospective modification of a judgment does not affect cases in which the court has retained jurisdiction over a judgment ordering periodic payments so that the amount of the payments can be adjusted as circumstances change. *See Ruggles*, 116 N.M. at 64, 860 P.2d at 197 (in certain limited circumstances court can reserve jurisdiction in distributing ex-spouse's interest in retirement benefits); *Spingola v. Spingola*, 91 N.M. 737, 741, 580 P.2d 958, 962 (1978) (child support); *Rabie v. Ogaki*, 116 N.M. 143, 860 P.2d 785 (Ct.App. 1993) (spousal support). The issue here is solely the application of Rule 1–060(B)(5) when neither the judgment nor a controlling statute preserves such jurisdiction in the district court. We also acknowledge that in circumstances different from those here, Rule 1–060(B)(5) may justify modification of a property award. *See Rudd v. Rudd*, 105 Idaho 112, 117–19, 666 P.2d 639, 644–46 (1983) (property to be sold no longer existed).

Finally, we note Husband's contention that the recent Supreme Court decision in *Ruggles* supports his view. We disagree. *Ruggles* discussed at length the principles that should govern the division of community retirement benefits. The Court stated that the preferred procedure is to divide vested benefits at the time of the divorce rather than ordering that the non-employee spouse's share of retirement benefits be paid as it comes in. In our view, *Ruggles* supports the result in this case by emphasizing the virtues of bringing marital litigation to closure.

## III. CONCLUSION

Because of the absence of any evidence that the error in calculating Husband's retirement benefits was the result of a post-decree event or events that could not have been anticipated at the time of the original decree, the district court erred in modifying the decree. We reverse the order of the district court and remand with instructions to reinstate the provisions of the original decree regarding monthly $600 payments from Husband to Wife.

IT IS SO ORDERED.

BIVINS and FLORES, JJ., concur.