**David BREWSTER, et al., Plaintiffs**

v.

**Michael S. DUKAKIS, et al., Defendants.**

**Civ. A. No. 76–4423–F.**

United States District Court,
D. Massachusetts.

Aug. 19, 1981.

Mental Patients Advocacy Project, Western Mass. Legal Services, Northampton State Hospital, Steven J. Schwartz, William C. Newman, Northampton, Mass., for plaintiffs.

Nonnie S. Burnes & Robert G. Bone, Hill & Barlow, Boston, Mass., for Mass. Assn. for Retarded Citizens.

Michael Broad, Catherine A. White, Asst. Attys. Gen., Boston, Mass., for Evelyn McLean-Linda Glenn.

Michael Ponsor, Brown, Hart & Ponsor, Amherst, Mass., for monitor for consent decree.

## MEMORANDUM

FREEDMAN, District Judge.

### I. INTRODUCTION

The disputes before this Court arise from differences in interpretation of the Consent Decree entered in this case on December 7, 1978.

In order to understand the position of the Court, a brief summary of the history and contents of the Decree is necessary.

The Complaint in this matter was filed in December 1976. The Decree was born out of two years of intense negotiation between the parties. The Court was completely neutral in this·process, in no way compelling agreement; every substantive or procedural obligation contained in the Decree has been voluntarily assumed by the parties, with the full knowledge that their agreement as ratified by this Court would constitute a binding order. Paragraph 4 of the Decree binds not only the Decree's signors but their successors and employees as well.

The target of this Decree is one of the most vulnerable and chronically abused seg-

ments of our society: those labelled mentally ill and mentally retarded.[1] Specifically, the plaintiff class is defined in Paragraph 7 of the Decree as "all persons who were, as of December 15, 1976, are, or may be hospitalized at the Northampton State Hospital, including those persons on indefinite visit or conditional discharge during that period."

The catchment area of Northampton State Hospital is Region One of the State Department of Mental Health (DMH). It includes all of Hampshire, Franklin, Hampden, and Berkshire counties, and a small portion of Worcester County. A shorthand definition of the plaintiff class then might be: all persons in the western third of the Commonwealth of Massachusetts with mental health needs severe enough to qualify them for potential hospitalization.

The Decree estimates that this group comprises approximately 2,135 persons during any two-year planning period.[2] A further group of 3,588 persons is designated the "at-risk subpopulation"—those persons who might find themselves in need of hospitalization if services available in December 1978 were cut back. See Attachment A of the Decree, and paragraphs 8c and 8d.

As might be expected with such a large group spread over such a broad and diverse geographic area, a wide range of disabilities is exhibited. Some class members suffer from chronic mental illness, having been hospitalized for thirty, forty, or in some cases in excess of fifty years. Others are suffering an acute episode which may respond quickly to treatment and never be repeated. Still others are "revolving door" clients whose illness may lead them to multiple, short admissions in any two-year period. Juveniles are treated in this system as well as geriatrics, whites as well as minorities. A few class members have histories of violence; the overwhelming majority offer a risk only to themselves, if anyone.

The body of the Decree and its attachments describe—and require—a dramatic transformation in the method of care for plaintiff class members. The defendants bind themselves to create no less than "a comprehensive system of appropriate, less restrictive treatment, training and support services for each member of the plaintiff class . . . ." Decree at paragraph 3.

The distinctive quality of the Decree lies in the commitment to treatment in a "comprehensive community mental health and retardation system," with three components: residential environments which are "the least restrictive and most normal setting appropriate for each resident or client"; non-residential programs designed to provide "the major daily activity for those clients whose residential environment does not provide the total treatment program, as well as for other members of the plaintiff class who live independently in the community"; and management services to oversee residential and non-residential programming. See Decree at Paragraph 8a.

Probably the most concrete ramification of the Consent Decree from the point of view of the service recipient or "client," is the transfer of mental health services from a large, state-run centralized institution to scores of much smaller, private community-based service facilities, spread out over the Region. These non-profit organizations vary widely in their size, experience, funding, administrative structure, staffing patterns and theories of treatment. Although some state personnel work in these programs, most personnel in the community system is private and therefore not subject to civil service regulations.

These agencies administer a wide variety of programs. Twelve distinct types of residential programs are described in Attachment B to the Decree. At least fourteen

---

1. Although Northampton State Hospital was intended to treat only mentally ill persons, a group of retarded persons was apparently transferred to the Hospital several years ago. In recognition of their inappropriateness at the Hospital, the Decree lays down special requirements for retarded persons. See paragraphs 20 to 22, and 46.

2. Only a fraction of this group actually resides at the Hospital at any one time. The current census at Northampton State Hospital is approximately 230 patients.

types of non-residential services are described in Attachment C.

The Decree, in addition, makes heavy demands on DMH's administrative structure. Specific provisions are made in the Decree for the development of Individual Service Plans (ISPs) to insure the complete evaluation and appropriate treatment of clients (paragraphs 26 to 31); for the drafting of governing regulations (paragraphs 32 and 33); for monitoring and evaluation of the system (paragraphs 38 to 40); and for the reorganization and phase-down of the Hospital (paragraphs 41 to 46).

The parties bind themselves in signing the Decree to the ongoing supervision of the Court both in the general implementation process and with regard to specific outstanding issues not finally resolved by the parties in the negotiation process. Paragraph 6 of the Decree states:

Jurisdiction is retained by the Court until further order, to enable any party to apply at any time for such further orders as may be necessary or appropriate for the interpretation, implementation, enforcement or modification of the terms of this Decree and for supervision and approval of the resolution of issues left for further planning and negotiation.

As will be seen, the issues left for further planning and negotiation—with supervision and approval of the Court—include some of the most crucial features of the Decree.

Finally, the plaintiffs and defendants have agreed to the appointment of an independent Monitor, responsible only to the Court, with a right of access to all information, records, residential environments, and program areas. The parties bind themselves to the proposition that, with certain limitations, the Monitor has the final word with regard to individual complaints and the power to make recommendations to the Court on any issue related to implementation of the Consent Decree. These recommendations become final and binding unless a Court hearing is requested by a party. *See* paragraphs 51–60.

Realizing perhaps that disagreements would arise during the implementation process the parties have given the Court in paragraph 50 extremely broad powers. This paragraph states:

The defendants agree to take all necessary actions to insure full and timely compliance with the provisions of this Decree. The parties recognize that there may arise during the implementation of this Decree, difficulties beyond the control of the defendants which may inhibit timely accomplishment of certain of its terms. Whenever the parties or the Monitor determine that such difficulties have arisen and significantly threaten implementation, the problem may be brought to the Court for its attention.

Over the past three years progress has been made in establishing the community mental health system. Non-residential and residential programming in the community has greatly expanded. Census at the Hospital has gone down. The administrative capacity of the Department of Mental Health has increased.

On the other hand, the concrete problems of implementation have to some extent undermined the ambitious promises of the Decree. The development of residential, non-residential and administrative components has often occurred only after long delays. Hospital census, which was originally intended to be at 50 by June 30, 1981, is still well over 200. Regulations have emerged tardily. The drafting of Individual Service Plans is at least eighteen months behind schedule.

Obviously, the creation of a community mental health system that provides treatment in settings that are more tailored to the client, more homelike and less restrictive can have enormous advantages. These settings can provide more appropriate care, with fewer of the dangers of long-term institutionalization and an enhanced enjoyment of basic civil liberties. It is equally obvious that a poorly designed or poorly implemented community mental health system leaves the client isolated, less visible and even more vulnerable to neglect and abuse. It is against this backdrop that the

controversy before the Court should be seen.

The current disputes between the parties center on the interpretation and application of two paragraphs of the Decree: paragraph 59, which addresses the subject of trained, independent advocates for clients; and paragraph 35, which addresses the subject of appropriate orientation, retraining and ongoing development of Hospital staff and employees of community programs. Both these issues were left unresolved in the negotiation process leading to the Decree. An evidentiary hearing was held on the question of advocacy on July 16, 1981 and on the subject of training on August 4, 1981.

## II. POWERS AND RESPONSIBILITIES OF THE COURT

■ A consent decree, speaking generally, has the quality of a contract between or among the parties entering into it; at the same time a decree, when ratified by the court, is a court order and calls into play the exercise of the court's equitable powers.

The Supreme Court has stated:

Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

United States v. Armour and Company, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

■ Thus, a court would not be justified in imposing some additional burden on the defendants, or substantially changing the terms, to justify some inferred "purpose" of a consent decree. United States v. ITT Continental Banking Company, 420 U.S. 223, 235, 95 S.Ct. 926, 933, 43 L.Ed.2d 148 (1974).

■ At the same time, the agreement of the parties does not extinguish the equitable or supervisory powers of the court. It is settled that the court retains the authority to resolve ambiguities in the language of a decree. United States v. Armour, supra, at 681, 91 S.Ct. at 1757; EEOC v. Safeway Stores, Inc., 611 F.2d 795, 798 (10th Cir. 1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980). Where changed legal or factual situations make it necessary, courts even retain the power to make modifications of a decree. United States v. Swift and Company, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); Gomes v. Moran, 605 F.2d 27, 30 (1st Cir. 1979).

In the Swift case, Justice Cardozo stated:

The result is all one whether the decree has been entered after litigation or by consent . . . . In either event, a court does not abdicate its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong.

286 U.S. at 114–115, 52 S.Ct. at 462.

To summarize, the parties to a decree may rest confident that they bind themselves only to what is agreed upon, provided that they are aware of the court's inherent supervisory role. The court, in the act of transforming a simple agreement between two parties into a court order—and inevitably placing the dignity of the court and its full range of sanctions behind the decree—may be confident that it retains some equitable powers of supervision, provided that these powers are exercised in a way that is sensitive to the parameters of the parties' original agreement.

Turning specifically to this Consent Decree, the Court finds its inherent powers ratified and dramatically expanded by the Decree's very provisions. Paragraphs 5 and 6 explicitly recognize that certain issues have evaded "final, substantive settlement" and that the Court's supervision and approval of the resolution of these issues is necessary. These unresolved issues are not trivial. They include: determination of need for and design of a secure treatment setting for those clients not appropriate for community placements (paragraph 16); the

content of a plan for orientation, retraining and ongoing development of Hospital staff and employees of community programs (paragraph 35); the content of a reorganization and phasedown plan for the Hospital (paragraph 43); the need for, role of and funding for trained, independent advocates for clients (paragraph 59). The failure to resolve definitively any one of these issues would create a gap in the Consent Decree and render its full implementation almost impossible.

Paragraph 6 of the Decree also confers on the Court not only ongoing jurisdiction but also the power to render "such further orders as may be necessary and appropriate for the interpretation, implementation, enforcement or modification of the terms of this Decree . . . ." Paragraphs 50 through 61 of the Decree establish in broad terms the powers of the Court and of the court-appointed Monitor.

In short, the Court's supervisory authority permeates the Decree, not only through its inherent equitable powers, but also by the express choice of the parties.

### III. LEGAL ADVOCACY

*A. The Interpretation of Paragraph 59*

Paragraph 59 of the Decree states as follows:

> The Monitor will investigate and determine the necessity for trained, independent advocates to assist clients in the protection of their rights as set forth in relevant statutes, regulations, and the provisions of this Decree, including the attachments hereto. The Monitor will submit his recommendation to the parties and the Court by January 1, 1980, on the appropriate role of and funding for such independent advocacy. The plaintiffs and defendants agree to cooperate in investigating sources of funding and in seeking federal funds to establish and maintain an advocacy system, to the extent such is determined to be appropriate.

In compliance with the first sentence of this paragraph, the court-appointed Monitor submitted his report and recommendations to this Court. A copy of the report is appended to this Memorandum as Appendix A.

In summary, the report finds that trained, independent advocates are necessary, and that effective advocacy services will disappear after June 1982. The report makes additional recommendations regarding the general composition of the advocacy apparatus: that it must be paid and full-time, include attorneys and lay advocates, have access to records, include clients themselves to the extent possible and be free from undue outside influence. Finally, the report recommends that the defendants be required to fund the advocacy system and report to the Court with a timetable and budget "that will assure no discontinuity of advocacy services within the Region."

With the permission of the Court and the parties, the Monitor's report was submitted over a year later than was originally required by the Decree. The delay permitted the employment of an expert consultant, Dr. Stanley S. Herr, who prepared and submitted an extensive report on the need for advocacy services, advocacy models, and potential funding sources. The Herr Report, which was also prepared for the assistance of the Court, Tauro, J., in *Massachusetts Association for Retarded Citizens v. Dukakis* (Nos. 75–5023–T and 75–5210–T), is part of the record of this case. The Herr report fully supports the findings and recommendations of the Monitor.

The Monitor's report to the Court was circulated to the parties and they were asked to respond to each of the report's seven recommendations, indicating support or disagreement. The plaintiffs' response generally supported the recommendations. The defendants' initial response, after a month delay, was to oppose the final two recommendations—which placed the responsibility for funding advocacy on the defendants—and to decline to agree or disagree with the other five recommendations. The defendants were not willing to take a position on the need for advocacy, only denied their responsibility to fund it.

More recently, the defendants appear to have altered their position, now contesting the need for advocacy services beyond those currently provided. They have continued to assert vigorously that the Decree neither imposes an obligation to fund advocacy services, nor gives the Court the power to impose such an obligation on them.

Certainly the defendants are right that the Decree does not explicitly impose on them the responsibility to fund advocacy services.

It is equally clear that the defendants are wrong about the powers conferred by the Decree on the Court. As noted, the question of advocacy services is one of the issues in the Decree left open, whose resolution is left subject to the supervision and approval of the Court, under paragraph 6 of the Decree. Moreover, as to this issue, the Court's Monitor is given important responsibilities. He is to "determine the necessity" for advocates and make a recommendation to the Court "on the appropriate role of and funding for such independent advocacy."

The Court holds that this paragraph along with the other enabling provisions of the Decree gives to the Court the power to accept or reject the Monitor's recommendations and, if the recommendations are accepted, order them to be carried out. To the extent that the paragraph contains any ambiguity on this point, the Court hereby exercises its supervisory power to remove the ambiguity. Any other interpretation of the Decree would leave the Court without the power to intervene where the inability of the parties to negotiate a resolution of an outstanding issue would undermine the expeditious implementation of the Decree and render it an incomplete document.

The defendants argue that their responsibilities are confined to those set out in the third sentence of the paragraph: "to cooperate in investigating sources of funding and in seeking federal funds to establish and maintain an advocacy system . . . ." It is their position that, even after making appropriate findings, no power would lie in the Court to place responsibility to provide advocacy on the defendants.

It flows from this argument that the recommendations of the Monitor to the Court would have no significance if they were rejected by the defendants. It also follows that the Court's role in providing supervision and approval of the resolution of outstanding issues would be entirely passive: the Court would have no power to order a resolution and the defendants would have the power to permanently block resolution of this and other critical areas of the Decree simply by refusing to agree.

This interpretation of the Decree is both dangerous and incorrect. It belies both the obvious intent of paragraph 59 and the other provisions of the Decree. Moreover, it derogates from the inherent equity power of the Court in supervising the implementation of the Decree. Clearly, the final sentence of paragraph 59 was intended to impose an additional task on the defendants, not define their exclusive responsibility.

The Court holds that it has the power within the four corners of the Decree as interpreted, as well as in the exercise of its general equitable and supervisory powers, to order the defendant to design and fund a system of advocacy for the plaintiff class members—provided that it supports this exercise of power with appropriate findings of fact determined after hearing at which the defendants are given full opportunity to argue and present evidence, as was done in this case.

## B. Factual Findings

The plaintiff class members involved in this lawsuit are particularly vulnerable to invasions of their legal rights.

First, they suffer the normal handicap of all economically disadvantaged persons—the inability to purchase legal representation.

Second, they suffer from the stigma of association with a State mental hospital, which renders them uniquely exposed to prejudice in housing, employment, access to generic services and in many other areas.

Third, this group has unique problems in recognizing and asserting its legal rights due to cognitive limitations or impaired ability to communicate. Many chronically hospitalized clients may become either so passive as a result of decades of confinement or medication, or become so fearful of authority, that they may lose the ability either to protect themselves or obtain protection.

Fourth, the sheer variety of the clients puts unique demands on any advocacy system: old and young, white and minority, chronic and acute, mentally ill and retarded are all contained within the class served under the Decree.

Fifth, the geographic spread of the clients, from the urban areas of Springfield to the rural areas of Berkshire County makes it extremely difficult to keep track of clients. Clients have the tendency—to use a phrase frequently heard during the implementation of this Decree—to "fall through the cracks" as they move from a large, centralized, State-run treatment setting like Northampton State Hospital, into small, atomized, privately administered treatment programs.

The plaintiff class members possess a wide variety of rights arising by virtue of their disabling condition or from their past or present institutionalized status. These rights are complex and multitudinous. They are defined under consent decrees, including this one, and under federal and state constitutions, statutes and regulations. With no mechanism for assisting mentally disabled persons in enforcing them, these rights might as well not exist.

By way of example, the rights conferred upon the plaintiff class by this Consent Decree alone include at least the following:

... to live in the least restrictive, most normal residential alternative suited to their individual needs;

to have their residential and non-residential needs determined and reviewed according to individualized planning processes;

to participate and be represented in those processes;

to be free from admission to the Hospital, if a mentally retarded client, unless by special exception of the RSA;

to due process in connection with transfers from the Hospital to the community;

to receive residential and non-residential services on a voluntary basis to the maximum extent feasible;

to be notified and given an opportunity to object to any proposed residential or non-residential placement;

to request a transfer at any time to a more appropriate, less restrictive setting, and to have such requests considered and acted upon in accordance with specified standards and procedures;

to file complaints with the Court Monitor; and

to initiate independent enforcement actions.

Herr Report, 20–21.

To cite just one segment of the Department of Mental Health's regulations, specifically promulgated pursuant to paragraph 32 of this Decree, the plaintiff class members have the following rights:

1. The right to be free from unlawful discrimination by the DMH or by programs licensed or regulated by DMH;

2. The right to religious freedom and practice without compulsion according to the client's preference;

3. The right to vote, including reasonable assistance when desired in registering and voting;

4. The right to communicate including the right to have access to a telephone for confidential calls and the right to receive unopened mail;

5. The right to representation by an attorney or advocate;

6. The right to be protected from commercial exploitation;

7. The free right of association, including the right to call meetings and receive guests in community programs;

8. The right to enjoy basic goods and services without threat of denial or delay, including a sound diet, clean and appropriate clothing, medical care, social con-

tact, daily activities, personal possessions, access to storage space;

9. The right to control provision of medical treatment;

10. The right to be free from specific forms of abuse including corporal punishment, verbal abuse, threat of transfer, inappropriate restraint.

See 104 C.M.R. 15.03(3) and (4).

Other regulations govern the use of restraint and seclusion (104 C.M.R. 15.03(5)), medication (104 C.M.R. 15.03(6)), labor (104 C.M.R. 15.03(7)), possessions and funds (104 C.M.R. 15.03(8)), access to records and record privacy (104 C.M.R. 15.03(9)).

104 C.M.R. 16.01 et seq. describes the complex process of individual service planning and the rights of clients in this process. This includes initial screening, comprehensive assessment, ISP development, the drafting of program specific plans to carry out the ISP, periodic reviews of the ISP, possible modifications of the ISP, and elaborate procedures for client appeals through administrative hearing and ultimately through judicial review under Mass.Gen. Laws c. 30A, § 14. See 104 C.M.R. 16.-11(4)(d).

Specific statutes give clients additional rights. See Mass.Gen.Laws c. 123, § 23 and c. 111, § 70E.

This enumeration is intended as an example merely, not exhaustive, of those rights possessed by clients because of their status as disabled persons, or as former or current residents of the Northampton State Hospital.

Persuasive testimony was offered at hearing, and the Court finds, that without trained advocates clients would suffer chronic and substantial deprivation of the rights afforded them under this Decree, under existing regulations and under State statutes.

Familiarity with the nature of the plaintiff class, the community mental health system and the applicable statutes, regulations and provisions of this Decree makes it possible to define more exactly what sort of advocate is needed if the Decree is to be fully implemented.

First, advocates must be legally trained. The Herr Report and the testimony of Dr. Herr demonstrate clearly that without legal training, and without the power to go to court for redress if necessary, advocates would lack the necessary knowledge, skills, and "clout" to function effectively. The advocacy system must include lawyers.

Second, advocates must be independent. Permitting DMH administrators or employees of direct care agencies sole responsibility for advocacy would, in the words of one witness, be like "letting the fox guard the henhouse." Promoting the interests of clients must inevitably mean conflict with DMH administrators and private vendor agencies.

Third, the advocacy system must have sufficient resources to permit representation of institutionalized clients and outreach efforts to community programs. To do this, advocates cannot be donating their time. The advocacy apparatus must have the financial and professional stability to permit comprehensive planning and reasonably sophisticated coordination of its efforts.

Fourth, advocates must have access to clients themselves and, with appropriate safeguards, client records. Giving an administrator or an agency the power to close off this access would quickly cripple an advocacy system.

The foregoing analysis permits the following findings: a need for advocacy services for plaintiff class members exists; these advocacy services must be sufficient to protect the rights of clients stemming from their condition of disability or status as currently or previously institutionalized persons; the advocacy system must include lawyers and others with legal training, must be independent, must have stable resources and must have access to clients and their records.

Two questions remain: are existing advocacy services adequate to meet the needs of plaintiff class members? If not, how is such advocacy to be obtained?

The Herr Report thoroughly reviews existing advocacy services, public and private, and finds them inadequate to meet even the minimal needs of clients. The Mental Health Legal Advisors Committee, established by the Supreme Judicial Court, is largely not engaged in advocacy for individual clients. The Developmental Disabilities Law Center concentrates its efforts solely on clients labelled retarded, who make up a tiny fraction of the plaintiff class. The Mental Patients' Advocacy Project, currently serving as counsel for the plaintiff class and offering comprehensive legal advocacy both at the institution and in the community, operates on a federal grant that will terminate on June 30, 1982 and will not be renewed.[3] The affidavit of the executive director of the Western Massachusetts Legal Services, funded under the Legal Services Corporation, confirms that organization's inability to provide comprehensive legal advocacy for the plaintiff class. Charitable efforts by members of the private bar have an *ad hoc* value at best. The courageous efforts of fledgling self advocacy groups, such as "On Our Own" are insufficient without the support of lawyers.

The defendants' testimony attempting to prove the sufficiency of advocacy efforts within DMH only demonstrated the contrary. The Department's Regional counsel testified it was not part of his function to offer individual representation to clients. The head of the Region's quality assurance team indicated the same. Further, he testified that one-day preannounced quality assurance visits to community programs occurred only once every two to three years. An attorney working for DMH in the Westfield Area testified to her efforts to set up voluntary human rights committees in Westfield's community programs. But she testified, first, that the committees, when constituted would have no enforcement powers. Second, she testified that no human rights committee was actually in oper-

ation in Westfield as of the date she testified. Finally, she stated that, to the best of her knowledge, none of the other four Areas in the Region employed an attorney in her role or had established any human rights committees. An appeals mediator working for the DMH in the Franklin/Hampshire area testified that: "I just try to mediate and if mediation does not appear possible, I clarify . . . I in no way represent clients."

To the extent that defendants have offered service coordinators, or other care givers, as "advocates" for clients, the Court finds that these individuals lack the expertise, independence and capacity, given their other responsibilities, to perform in the manner required.

The Court finds that after June 30, 1982, no comprehensive or effective advocacy services will exist within Region One to protect the legal rights of plaintiff class members.

The last question is by far the most difficult and the one most hotly pressed by the defendants. Who shall be responsible for the advocacy system?

On the one hand, the Court cannot help taking note of, and sympathizing with, the State's fiscal problems. More importantly, the Court has no desire to involve itself in the administration of the State's mental health system.[4]

On the other hand, at least three considerations press the Court to require advocacy.

First, unless the State takes responsibility for establishing the advocacy apparatus, there will be none. Put differently, the choice is not between a State-supported advocacy system or one supported by some other stable sponsor; it is rather between a State-supported system or none at all.

---

**3.** According to testimony, the Project handled over 1,500 cases for class members in one twelve-month period, 1980–81. No replacement of these services is currently planned by the defendants.

**4.** For a helpful discussion of the general issues this Court is grappling with, *see* Note, "Implementation Problems in Institutional Reform Litigation" 91 Harv.L.Rev. 428 (1977).

Second, the cost is not great. The sample budget for an advocacy system, proposed by the Monitor and appended to his report, suggests costs amounting to well less than one-half of one per cent of the annual operating budget of Region One of the Department of Mental Health.

Third, the Court finds the need to be critical, and inherent in the very scheme of the Decree. A system of advocacy is not a luxury for the plaintiff class but, given the Decree's other requirements, an absolute necessity.

The Decree calls for the dispersal of client services into privately run programs from one end of the four-county Region to the other. The Monitor's reports submitted to this Court after review by the parties have alerted the Court to the risk that this Decree might become—through incompetence, inadequate funding, or for some other reason—a justification for "dumping" clients out of the institution into poor quality treatment programs, or pushing them from the institution without any program at all. Already the Court has been warned of a large number of clients "falling through the cracks" in the community mental health system, and winding up in substandard housing or, homeless, on the streets. The Court is not willing, personally or institutionally, to provide through this Decree a sanction and a disguise for the continued neglect and abuse of persons labelled mentally ill. Without some minimal system of legal advocacy, members of the plaintiff class will be in the words of Dr. Herr, falling into "chasms, not cracks."

It is worth noting, in addition, that at least one other court has placed the responsibility for providing advocacy services on defendants in a similar case. *See Halderman v. Pennshurst State School and Hospital*, 612 F.2d 84, 113 (3rd Cir. 1979), reversed on other grounds, —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

Finally, the Court finds that the vigorous involvement of plaintiffs' counsel in the implementation of this Decree has substantially reduced the need for judicial oversight. The disappearance of active counsel will inevitably require Court involvement in the minutiae of implementation.

█ With regard to the question of advocacy, then, the Court hereby orders the defendants to submit, no later than October 1, 1981, a plan for a system of independent, legally trained advocates, capable of representing clients in connection with legal issues arising from the clients' disability or status of prior or current institutionalization. A timetable and budget must be submitted with the plan that will insure that the system is fully operational no later than June 1, 1982. The Court is requiring this date to permit thirty days of overlap with the Mental Patients Advocacy Project and insure no discontinuity of services. The advocates must be independent of the Department of Mental Health, and must be paid and full-time. A sufficient number of lawyers must be employed by the system to insure adequate supervision of lay advocates and court representation where necessary.

## IV. HUMAN RESOURCES

The second issue grows out of the Consent Decree's human resource requirements. Again, the Court must both construe the meaning of a paragraph of the Decree and make findings of fact regarding compliance with the paragraph.

In paragraph 35 of the Decree, the defendants placed upon themselves four obligations. These obligations have endured through various amendments of the paragraph.

First, they agreed to "provide all new employees with appropriate orientation and training programs to increase their skills and interest in achieving service goals for clients." Second, the Decree states "the defendants agree to provide staff persons employed in new residential and non-residential programs with training appropriate to their tasks as set forth in Attachments B and C." Third, the defendants stated that "those Hospital employees for whom employment in community settings is both desired and suitable will be offered retraining

to permit them to serve appropriately the needs of clients in these community programs." Finally, to accomplish and report to the Court on these efforts the defendants agreed to work with the plaintiffs so that "[t]he parties will prepare by October 1, 1979, a plan for orientation, retraining, and ongoing development of Hospital staff and employees of community programs."

The history of paragraph 35 of the Consent Decree is illustrative of the frustrations encountered in implementation. As originally drafted it is a relatively simple provision containing the elements described above.

A few days prior to October 1, 1979 a motion to amend paragraph 35 was submitted, assented to by all parties, which extended the date for submission of a final human resources plan to January 1, 1980. Elaborate provisions for substitution of a draft plan by October 1, 1979 were added to the paragraph, but are not relevant here.

The rationale for the extension to January 1, 1980 was the need to undertake a manpower survey of hospital employees to determine their interest in and fitness for employment in community programs.

A second motion to amend paragraph 35 was submitted on January 15, 1980. The rationale for this requested extension was the need to collect information on salaries to be incorporated in the final plan. Again, the defendants received the extension, this time to May 15, 1980.

On May 14, 1980 the Monitor was notified in writing that a further extension was needed because of the "enormous magnitude" of the final plan. An informal extension was granted.

By July 1980 a 145-page draft plan comprehensively addressing a broad range of troublesome personnel issues, and fully satisfying the provisions of paragraph 35, was submitted by the Regional Office to the DMH Central Office and shared with the plaintiffs and the Monitor.

On August 25 and September 16, 1980 the Monitor held conferences in Boston regarding obstacles to implementation of the Decree, with a stenographer present. At these conferences the Monitor was informed by various representatives of the defendants that the Regional DMH plan was being reviewed at other levels of the Executive and that a final plan would shortly be submitted to the Court which would address not only training but other broader personnel issues such as salary adequacy and career ladders. It was informally agreed that the final plan of the defendants would be submitted on September 30, 1980.

On September 25, 1980, the defendants again moved for an extension of time to submit their final plan. The motion cited the magnitude of the draft under consideration and the "complexity and scope" of their efforts. It sought an extension of time to submit the final plan to December 1, 1980. The extension was allowed but only until November 1, 1980.

On October 31, 1980, after a delay of more than a year (during which time no comprehensive training efforts were being made either with regard to hospital or community staff), after repeated protestations regarding the magnitude of the plan and the need to gather extensive data, the defendants submitted a six-page document which they represented as their final plan. As will be seen, this plan is no more than a collection of generalities that pay lip service to the wording of paragraph 35 without beginning to satisfy its provisions substantively.[5]

A non-evidentiary hearing was held before this Court on December 18, 1980, with the Secretaries of Administration and Finance and the Executive Office of Human Services, present. The Court requested that the defendants develop an amended plan to satisfy what the Court and the Monitor felt were some of the clear inade-

---

5. Although the Decree requires "the parties" to prepare a plan, the defendants have always assumed responsibility for drafting the plan, because of their expertise and responsibility for implementation. The plaintiffs have never accepted the defendants' plan, creating the current deadlock.

quacies of the six-page final plan as submitted. The deficiencies of the plan were spelled out in writing by the Monitor in a letter to the defendants.

In response to the listing of deficiencies the defendants submitted, in January of 1981, their "Administrative Plan" for implementation of the six-page human resources plan. The "Administrative Plan" was intended to give the Court some notion of the defendants' specific intentions with regard to human resources. However, the defendants insisted that the plan was entirely discretionary and that none of its terms should be considered binding or incorporated in the Decree.

The "Administrative Plan" is an ambitious scheme for a schedule of orientation sessions and the development of a core curriculum to form the basis of intensive training. As of August 1981 virtually none of its provisions has been carried out.

Thus, nearly two years after the original date required for submission of a final plan for "orientation, retraining, and ongoing development of Hospital staff and employees of community programs," next to nothing has been done. The plan before the Court is still the six-page document which the defendants insist satisfies paragraph 35 and the plaintiffs condemn as inadequate.

This long summary of the history behind implementation of paragraph 35 is offered for two reasons. First, it gives the lie to any accusation that the Court has acted hastily or impatiently with regard to defendants' efforts to satisfy this paragraph. Second, it demonstrates what the Court believes to be conduct amounting to outright bad faith on the part of the defendants.

It is no consolation that this bad faith cannot be laid at the feet of any one individual. It can be described as the bad faith of the defendants collectively, or perhaps as systemic bad faith. Nevertheless, specific representations were made to this Court through the Monitor as to the magnitude and content of the final plan being drafted by the defendants. The representations were not vindicated by subsequent events. A discretionary "Administrative Plan" was offered to the Court purporting to show the intentions of the defendants; few if any of the elements of this plan were actually carried out.

When delays and misrepresentations occur to this degree, the Court has forced upon it only two options: intervene or abdicate.

Turning to the plan as submitted under paragraph 35, the Court finds it inadequate for the following reasons. First, the sections describing the orientation effort lack any proposed budget, lack specification of a person or persons to be responsible for coordinating orientation, lack a timetable for orientation sessions and lack details of the content of orientation.

Second, the sections describing the defendants' proposed training efforts are inadequate for the following reasons: no details of training content are offered, no persons responsible for coordinating training are identified, no timetable for provision of necessary training is established, no budget is offered for the training effort, no procedures are established to insure that all employees of private contract agencies are properly trained.

Third, the six-page plan completely lacks any details regarding ongoing development of Hospital and community staff. Minimally, procedures must be established to insure that new staff are pulled into training programs and that the professional expertise of program staff is monitored and upgraded.

Putting aside the plan and looking directly at the training efforts actually made, the progress can be described simply and emphatically. Virtually no training has been done, except on an *ad hoc* basis by individual vendors or particular Area staff.

The Executive Director of the Western Massachusetts Training Consortium, the agency whose contracts with the DMH provide most of the resources for developing a comprehensive training effort, testified that, as far as orientation sessions, only one pilot session has occurred. None further

was planned. Due to delays in contract approval, only a little over one month's work was done in developing the core curriculum for training. No training sessions are scheduled.

Dr. David Specht, also of the Western Massachusetts Training Consortium, testified as to the results of his manpower turnover study. According to his study, there is a 54.8% turnover in direct care staff in the average community program annually. Only one-third of community employees have worked in their agency for more than a year. There is a 40% turnover of residential supervisory staff. Specht found that in most community programs staff were placed on the job without any training whatsoever. He also found that during a six-month study of 13 agencies and 192 staff, no agency reported any dismissal of staff. Specht cited lack of adequate salaries, lack of appropriate orientation and training programs and absence of career ladders as the main reasons for the high turnover of staff.

The defendants' evidence only confirmed the impression made by the plaintiffs' witnesses. Elaine Ostroff, the DMH person responsible for training admitted on direct examination that a statewide system for training "really does not exist at this time . . . . Very little training is provided in a consistent, ongoing way." Ms. Ostroff described the beginning of an effort at development of the core training curriculum, orientation programs and supervisor training; while encouraging, these beginnings have as yet produced little in the way of concrete results.

Based on the foregoing the Court finds that the defendants have not only failed to submit an adequate plan as required by paragraph 35, but have failed to satisfy the substantive provisions of that paragraph requiring provision of appropriate orientation, training programs and ongoing development for community and Hospital personnel.

It was for good reason that the personnel and training provisions formed a central feature of the Decree. The decentralized nature of the proposed community system means that, if treatment is to be consistent and adequate, a comprehensive supervisory and planning role must be played by the DMH in the area of training. This is particularly true in an isolated community program which, unlike a large medical facility, lacks a concentration of trained medical personnel to oversee, to at least some extent, the direct care staff. The fear remains—and clearly has been realized to some extent—that underpaid persons with little or no training or supervision will be given responsibility in community programs for the day-to-day treatment of class members. Concrete, comprehensive steps by the defendants to confront this problem have been practically non-existent.

With regard to human resources, the Court makes the following orders:

1. The defendants will submit to this Court, no later than October 1, 1981, a comprehensive plan for training, orientation and ongoing development of community and Hospital staff. The plan will satisfy all the deficiencies enumerated in this Memorandum.

2. The plan will insure that a final draft of a core curriculum for training of supervisory and direct care staff is approved and submitted to this Court by all defendants no later than November 1, 1981.

3. The plan will insure that appropriate retraining programs are available for interested Hospital staff no later than February 1, 1982.

4. The plan will insure the orientation of all community and Hospital staff no later than April 1, 1982.

5. The plan will insure that all supervisory and direct care staff receive training under the core curriculum no later than June 30, 1982.

6. Any requests for extensions of the timelines in this Order will be filed prior to the expiration of the date to be extended and will be supported by affidavit setting forth the reasons for the request.

## APPENDIX A

### MONITOR'S REPORT REGARDING NECESSITY FOR TRAINED ADVOCATES

This Report is submitted pursuant to Paragraph 59 of the Consent Decree, which requires the Monitor to "investigate and determine the necessity for trained, independent advocates to assist clients in the protection of their rights . . ." and "to submit its recommendation . . . on the appropriate role of and funding for such independent advocacy."

Two sources provide the foundation for this Report. First, and primarily, close experience with implementation of this Decree over two years and thousands of hours has provided the Monitor with direct knowledge of the concrete realities and needs of mentally disabled persons living in the community. Second, the comprehensive report of Dr. Stanley S. Herr, of Harvard Law School, commissioned by this Court for use in the *Brewster* Decree and other Decrees, has afforded the Monitor and this Court an excellent summary of thought on advocacy nationally. This lengthy report is appended.

On the question of the necessity for advocates, the Court Monitor determines that independent, trained legal advocates *are* necessary to protect adequately the rights of the plaintiff class in the coming years. This conclusion is supported unanimously by the literature and court decisions on the subject.

The most obvious justification for this conclusion lies in the extreme vulnerability of the group to be protected. The abuse and neglect suffered by mentally disabled persons in institutions and in the community, historically and to the present, is too glaring to require particularized support. While fledgling self-advocacy groups composed of ex-hospital clients have some power to articulate their own needs and desires, even these groups would be the first to admit that without training and support their voices may have little impact.

In addition, the extreme complexity of the evolving law expressing or related to the rights of the mentally disabled demands trained legal advocacy. The Herr Report details some 20 pages of specific areas where regulations, court decisions, statutes or other sources of law are found applicable to mentally disabled persons. The advocacy of these rights is often literally a matter of life and death. No untrained lay person could be expected to comprehend the various sources of applicable law, let alone fluently argue from them in support of mentally disabled persons. *See Herr*, pp. 10–31.

Third, existing mechanisms for advocacy are clearly inadequate, either in terms of their current capacity or their long-term ability to provide services. The Herr Report carefully analyzes the capacity of existing advocacy services in the Commonwealth and finds that, with one exception, the services are not able to meet the advocacy needs of this client group. The one exception is the Mental Patients' Advocacy Project, a nationally recognized advocacy group currently representing the plaintiff class in the implementation of this Consent Decree and operating under a grant from the National Institute of Mental Health (NIMH). The funding grant for this organization, however, will terminate in June of 1982. Thus, unless preparations are made within the next few months, current advocacy resources will expire on this date. *See Herr*, pp. 39–57.

Finally, the disappearance of adequate advocacy services may force this Court to act, as a practical matter, as the permanent advocate or protector of the plaintiff class. A well established advocacy system reduces or eliminates the need for constant recourse to the federal court and avoids the possibility of this lawsuit becoming an open book in perpetuity.

Having determined the necessity for trained, independent advocates, the Monitor is required then by the Decree to make recommendations as to the appropriate role of and funding for these advocates. While the theoretical role of an advocacy system

could be discussed indefinitely, the necessary features of an independent legal advocacy system for mentally disabled persons in this Region are easy to summarize.

First, advocates must have thorough legal training. They must be familiar with the evolving law as expressed in regulation, statutes and court decisions. They must have minimal training in both informal negotiation and formal trial practice. This requires that the system contain attorneys, though they may be supported by legally trained advocates.

Second, the advocacy system must have a capacity to respond and assist clients in their relationships with state agencies, with private non-profit agencies and with a society at large. This means that the advocacy system must have the potential to do both individual client advocacy and systemic litigation. In short, the advocacy system must have a high degree of flexibility and expertise to confront a wide variety of problems.

Third, the advocacy system must be capable of making contact with its clients. Since the *Brewster* population will be scattered in various residences and treatment sites throughout the Region, this will require considerable outreach efforts and availability at a variety of locations. It will also require that, within established limits, advocates have access to client records and that defendants insure that no private agency prevents advocates from contacting clients. To increase the likelihood of fruitful contact, the advocacy system should make efforts to include ex-hospital patients or other clients within the system.

Fourth, advocates must be free from any undue influence from the agencies or persons with whom they may have an adversarial relationship.

In order to play the role described above, the advocacy system must be full-time, must be paid, must contain a mixture of attorneys and legal paraprofessional advocates and be capable of performing on-going training for its staff. The Herr Report describes in detail the general role of the advocacy system at pages 59 through 99.

The practical feasibility of this proposed system is demonstrated by the fact that the system really exists and is currently functioning in this Region. The Mental Patients' Advocacy Project comprises three attorneys and five paralegal advocates performing a broad spectrum of advocacy across the four counties of Western Massachusetts, both at Northampton State Hospital and at a wide variety of community programs in the Region's five Areas.

The final topic of this Report is the question of funding for the independent legal advocacy system. On this issue, two principles must be observed. First, the funding source must be stable and reliable. Second, the funding source cannot compromise the independence of the advocacy system.

Many potential sources of funding for legal advocacy are set out in the Herr Report at page 100 and following. One of the most promising external sources of funds may be the federal government itself. Section 502 of the recently enacted Mental Health Systems Act empowers the Secretary of Health and Human Services to make grants to providers of advocacy services. It is worth noting that these grants may be made only if the entity:

(A) has the authority and ability to pursue legal, administrative, and other appropriate remedies to ensure the protection of the rights of mentally ill individuals, and

(B) is independent of any entity which provides treatment or services to mentally ill individuals.

While many sources of funds potentially exist, the locus of *responsibility* for assuring adequate funding of the advocacy system can only be with the defendants. Federal grants, private foundations, and local universities and law schools may help, and may even assume the bulk of cost, but they do not have the long-term stability and reliability to assure continued existence of an advocacy system. It will therefore be the recommendation of this Report that the responsibility for assuring and, if necessary, supplying adequate funding of the advocacy system lies with the state.

This recommendation is not inconsistent with the independence of legal advocates. The defendants currently provide substantial funding for civil and criminal legal assistance to indigent persons without compromising the independence of that advocacy system.

As an example of an advocacy program which would be adequate to safeguard minimally the various legal rights of the plaintiff class for the indefinite future, a sample administrative structure and proposed budget is appended. This information is based on the current budget for the Mental Patients' Advocacy Project. Please note that the annual proposed budget represents less than one-half of one percent of the current operating budget for the defendants' services in the four counties of Western Massachusetts.

In summary, the finding and recommendation of the Monitor in this matter are as follows:

1. There is a necessity for trained, independent legal advocates to assist all class members in the protection of their rights as set forth in relevant statutes, regulations, and the provisions of this Decree.

2. Without action, adequate legal advocacy services for the plaintiff class will disappear after June, 1982.

3. The advocacy system must be capable of intervening through legal means in the relationship of clients with agencies of state government, with private non-profit agencies providing direct service, and with the society at large.

4. The advocacy system must include attorneys, though it may also incorporate legally trained para-professionals. Advocates must be trained, paid and full-time. Advocates must have access to client records through appropriate procedures and access to clients themselves in community programs. Clients should be encouraged to work with the advocacy system.

5. The advocacy system must be free of undue influence by the agencies with whom they are likely to have an adversarial relationship.

6. The defendants must adequately fund the legal advocacy system, though federal or other sources may generate some or all of the needed monies.

7. Defendants must provide the Court by March 16, 1981 with a timetable. and proposed budget that will insure no discontinuity of advocacy services within the Region.

Plaintiffs and defendants will submit their responses to these recommendations by February 27, 1981. As to *each* recommendation, plaintiffs and defendants should indicate whether they agree or disagree. As to each point where there is disagreement, plaintiffs or defendants should indicate the grounds or reasons for disagreement and suggest alternatives to the proposed recommendation.

Respectfully submitted,

/s/ Michael A. Ponsor

MICHAEL A. PONSOR,
Court Monitor
BROWN, HART & PONSOR
35 South Pleasant Street
P. O. Box 63
Amherst, MA 01004
(413) 256–8125

PROPOSED ADMINISTRATIVE STRUCTURE
AND BUDGET

I ANNUAL (FY '83)

| A. Personnel | Salary | Fringe | Total |
|---|---|---|---|
| Director | $25,500 | $2,550 | $28,050 |
| Attorney | 23,800 | 2,280 | 26,080 |
| Attorney/Training Director | 16,600 | 1,660 | 18,260 |
| Advocate | 13,000 | 1,820 | 14,820 |
| Advocate | 12,200 | 1,710 | 13,910 |
| Advocate | 10,600 | 1,484 | 12,084 |
| Advocate | 9,800 | 1,372 | 11,172 |
| Advocate | 9,800 | 1,372 | 11,172 |
| Office Manager | 12,000 | 1,680 | 13,680 |
| Secretary | 10,800 | 1,512 | 12,312 |
| Sub-totals: | $144,100 | $17,440 | $161,540 |

| B. Non-personnel Costs | |
|---|---|
| Rent | $ 11,340 |
| Utilities | 342 |
| Telephone | 9,720 |
| Copying | 1,129 |
| Insurance | 1,512 |
| Travel | 9,720 |
| Consumables | 2,322 |
| Postage | 1,296 |
| Equipment | 2,160 |
| Library | 1,080 |
| Service Contracts | 540 |

| B. Non-personnel Costs (cont.) | Salary | Fringe | Total |
|---|---|---|---|
| Miscellaneous | 540 | | |
| Litigation Expense | 3,240 | | |
| Sub-total: | | | $ 44,941 |
| Personnel and Fringe: | | | 161,540 |
| Consultants: | | | 5,000 |
| TOTAL: | | | $211,481 |

II. PHASE–IN COSTS (FY '82)

| | | |
|---|---|---|
| April (¹⁄₃₄ total cost) | | $ 8,662 |
| May (¹⁄₃₄ of cost) | | 8,662 |
| June (²⁄₁₂ of cost) | | 17,624 |
| TOTAL: | | $ 34,948 |